**OVERFIELD v. PENNROAD COR-
PORATION et al.**

**WEIGLE v. SAME.**

Nos. 258, 938.

District Court, E. D. Pennsylvania.

Dec. 20, 1941.

Daniel O. Hastings, of Wilmington, Del., Philip H. Strubing, of Philadelphia, Pa., R. E. Lee Marshall and George C. Doub, both of Baltimore, Md., Hugh F. O'Donnell, of New York City, Caleb R. Layton, 3rd, of Wilmington, Del., Harold J. Conner, of Philadelphia, Pa., Daniel Blumenthal, of New York City, and Macin E. Estill, Lynn L. Detweiler, Harry Reiss Axelroth, James McG. Mallie, and Hugh Roberts, all of Philadelphia, Pa., for plaintiffs.

C. B. Heiserman, John Dickinson, John B. Prizer, Philip Price, Robert T. McCracken, George G. Chandler, Wm. Clarke Mason, W. Heyward Myers, Jr., Thomas B. K. Ringe, Ernest R. von Starck, R. Sturgis Ingersoll, and Warwick Potter Scott, all of Philadelphia, Pa., Ballard, Spahr, Andrews & Ingersoll, Thomas Stokes, and John Sailer, all of Philadelphia, Pa., Elder W. Marshall, of Pittsburgh, Pa., and Lewis M. Stevens, Medford J. Brown, and Stradley, Ronon & Stevens, all of Philadelphia, Pa., for defendants.

WELSH, District Judge.

This matter involves two complaints, one by Ione M. Overfield and the other by Grace Stein Weigle. They are substantially the same, in that they are derivative stockholders' suits brought on behalf of Pennroad against the Pennsylvania Railroad and the former directors of Pennroad. Jurisdiction in both actions is based on diversity of citizenship. The complaints allege an interlocking relationship between the individual defendants as directors and officers of the Pennroad and of Pennsylvania. They include and set forth letters dated April 24, 1929, to Pennsylvania stockholders, a voting trust agreement dated May 1, 1929, and aver that sales of Pennroad voting trust certificates of over $141,000,000 were made. It is charged that Pennsylvania, through its officers and agents and by means of the said voting trust agreement, took and retained control of Pennroad although it invested nothing in Pennroad securities.

The Weigle bill describes eight large purchases alleged to have been made pursuant to a premeditated and preconcerted fraudulent scheme to use the funds and powers of Pennroad for the benefit of the Pennsylvania, each of which are alleged to constitute a separate cause of action. The Overfield complaint originally involved only one of the investments complained of in the Weigle suit but was subsequently amended, with leave of court to include all of the charges of the Weigle bill. 39 F.Supp. 482.

As the record now stands the bills in the Weigle and the Overfield suits both contain, in addition to the allegations as to jurisdiction and to the general course of dealing between Pennsylvania and Pennroad, complaints based upon the following particular investments and transactions: The purchase by Pennroad of the

(1) stock and other securities of the Detroit, Toledo and Ironton Railroad for $36,000,000.

(2) substantially all of the stock of Canton Company for $13,432,817.90.

(3) 220,000 shares of the stock of the Pittsburgh and West Virginia Railway at $170 per share.

(4) 402,119 shares of Seaboard Airline Railway for $4,523,838.75.

(5) 10,000 shares of Lehigh Valley at a price largely in excess of its investment value.

(6) 148,800 shares of common and 1,200 shares of preferred stock of the New York, New Haven & Hartford Railroad Company for $17,301,851.25 and $149,300, respectively.

(7) securities of the Boston & Maine Railroad Company for $23,637,708.38, and

(8) the promotion by Pennroad in June, 1929, of National Freight Company, and

the furnishing of its capital in the original amount of $2,300,000, and finally a total of over $4,000,000.

As to all of these investments, it is alleged that they had a special value to Pennsylvania apart from any value of the same as an investment to Pennroad, and that Pennsylvania fraudulently caused Pennroad to make such investments for its own benefit. In particular, it is alleged that Pennsylvania had previously considered purchasing the Detroit, Toledo & Ironton Railroad and had abandoned negotiations, but through its domination caused Pennroad to make the purchase at a price which Pennsylvania had considered excessive in the absence of certain assurances as to continuation of Ford freight traffic. Pennsylvania had likewise previously considered the purchase of the Canton Company for the express purpose of securing control of the Canton Railroad but had concluded that the special value of Canton Company to Pennsylvania as a traffic producing agency would not exceed $9,500,000. Upon discovering that Canton was about to be sold to a competing railroad, Pennsylvania directed its banking agents to purchase the Canton Company for Pennroad and that they did so at an excessive price. It is also alleged that prior to the purchase of the Pittsburgh and West Virginia by Pennroad, Pennsylvania deemed the acquisition of that company necessary to prevent it going to a competitor and thereby injuring Pennsylvania's strategic and competitive position, that the price paid by Pennroad as directed by Pennsylvania was greatly in excess of the intrinsic value, and that an enormous loss to Pennroad resulted. It is alleged that the purpose of Pennsylvania in causing the purchase of Seaboard Airline stock was to improve and strengthen the strategic position of Pennsylvania as a competitor for traffic of the Seaboard exchanged at Washington, and that the price paid was out of proportion to the real value of the stock and that the result was a complete loss to Pennroad, although Pennsylvania continuously enjoyed substantial benefits therefrom. It is alleged that the purchase of Lehigh Valley stock was to further secure Pennsylvania's control of that railroad so that in consolidation plans then pending, Pennsylvania might exercise complete domination over the Lehigh Valley, that Pennsylvania did so benefit, and that Pennroad suffered large losses by reason of said purchase. As to the New York, New Haven & Hartford, it is charged that Pennsylvania caused Pennroad to make this purchase to secure for Pennsylvania a working control of the New York, New Haven & Hartford for the improvement of Pennsylvania's strategic and competitive position. Pennsylvania had previously purchased 200,000 shares of that company. The purchases made by Pennroad inflated the market value beyond a normal investment level, made the cost of the stock considerably in excess of its investment value and caused Pennroad severe losses while greatly benefitting Pennsylvania. The purchase of the Boston & Maine was made in pursuance of Pennsylvania's desire to dominate New England railroad operations and for that purpose it caused Pennroad to purchase the stock at a price much higher than the investment value.

As to the National Freight Company, it is alleged that by promoting and causing Pennroad to make the capital investment in that company, Pennsylvania acquired control of the routing of less than carload lot traffic within its territory; that prior to organization of Pennroad, Pennsylvania had planned to accomplish the same results through an owned subsidiary or affiliate of Pennsylvania, but in May, 1929, Pennsylvania decided to cause Pennroad to put up all of the money, take all of the chances and losses, while Pennsylvania retained profits, advantages and benefits of the project without risk. Pennroad assumed responsibility for all financial requirements of the company, including the cost of leases from Pennsylvania, with the understanding that all traffic secured should be routed over the Pennsylvania lines. It is alleged that from the beginning and for a period of about four years National Freight suffered constant heavy losses all of which were paid by Pennroad, while during the same period the freight company continued to pay rentals and furnish Pennsylvania a large and profitable volume of traffic. Pennsylvania was advised by Pennroad of the losses and thereafter Pennsylvania made some efforts to lighten those losses without giving up any benefits. In March of 1933, Pennsylvania concluded to abandon the venture and so advised Pennroad, whereupon Pennroad sold the National Freight Company for $400,000 represented by notes which were sold for $381,000, resulting in a loss of

over $4,000,000 to Pennroad, while Pennsylvania received freight revenues and rentals in excess of $5,000,000.

It is alleged that the defendants, except Wayne who was not originally a director, conspired and created the fraudulent scheme to cause Pennroad to make the investments complained of for the benefit of Pennsylvania and that the defendants concealed the scheme from Pennroad certificate holders. Plaintiffs aver that they did not learn of the facts concerning those investments until 1938 after the Wheeler investigation, and charge that the transactions complained of constitute reckless and wanton disregard by the defendants of their duties arising from dual relationships and conflicting interests.

The prayers of the complaints are that the defendants be jointly and severally held liable for all losses incurred by Pennroad, that Pennsylvania be adjudged liable for reimbursement to Pennroad for all benefits received by Pennsylvania by reason of the transactions described, that Pennsylvania account for and pay to Pennroad all gains and profits accruing to it from the said transactions, that an account be stated showing the losses suffered by Pennroad through its participation in the said transactions and that a judgment be entered in favor of Pennroad and against the defendants for such losses.

The various defendants filed answers to the Weigle complaint, which answers have been, with leave of court, taken as the answers to the Overfield complaint as amended.

The answers of Pennsylvania admit the averments of the complaint with regard to jurisdiction and relationship of the various defendants and the authenticity of the plaintiffs' exhibits. It acknowledges that 5,800,000 shares of Pennroad stock were issued to the voting trustees and that the voting trustees' certificates were offered at $15 per share, a large percentage of them having been subscribed for by stockholders of Pennsylvania. The incorporators of Pennroad subscribed for 67 shares, and that of the eight directors constituting the original board of Pennroad, seven were members of the board of Pennsylvania. Mr. Lee, director and president of Pennroad, had resigned as treasurer of Pennsylvania, and Mr. Ogden, vice-president and treasurer of Pennroad, and subordinate officers of Pennroad had been employees of Pennsylvania. It is admitted that the voting trustees were persons who were also at that time the president and two directors of the Pennsylvania. It is further admitted that prior to the organization of Pennroad persons who were then officers of the Pennsylvania had conducted negotiations with the owners of Detroit, Toledo & Ironton looking to the possible purchase of its securities, but it is averred that the Pennsylvania was not intended to be the purchaser of such securities. Consideration by the Pennsylvania officials and directors had been given to the possible terms upon which the Canton Company could be acquired and to the value of the stock and property of that company, but the discussions and negotiations were terminated without any agreement to purchase such property by or on behalf of the Pennsylvania having been made. It is admitted that for some time prior to the organization of Pennroad, Pittsburgh & West Virginia had occupied a position of strategic importance as a railroad and that the control of the company had come to be of substantial value to any purchaser; that Pennsylvania had purchased and sold for its own account stock of the New York, New Haven & Hartford and that the National Freight Company had leased railroad facilities from Pennsylvania and paid rentals for the same, and had furnished to Pennsylvania a volume of freight traffic.

The answers of the Pennsylvania set forth additional separate defenses to the effect that plaintiffs had shown insufficient excuse to demand that Pennroad bring suit in compliance with the requisites of the rules of court governing secondary actions by stockholders; that the plaintiffs had waived any possible rights by estoppel and laches, and that the complaint fails to state a claim upon which relief can be granted.

The Pennroad Corporation filed its answer acknowledging the sale of its shares to the public at prices ranging from $15 to $17 from which Pennroad received the gross sum of $54,285,000 and that trust certificates therefor were issued by the voting trustees. It acknowledges the purchases and investments alleged in the bill, and that its board of directors on June 2, 1929, decided to promote a freight forwarding company. Thereafter Pennroad formed the National Freight Company and supplied it with capital in the amount of $2,300,000 and from the beginning and continuously thereafter the freight company suffered constant heavy losses. On

March 30, 1933, Pennroad sold the freight company for $400,000 in notes, which notes were sold for $381,000. Pennroad denies knowledge or asserts the immateriality of all other allegations in the bill of complaint. Pennroad affirmatively declares that since incorporation it had functioned as an independent organization in furtherance of its own powers and interests. All purchases were bona fide for value and made in the interest and exercise of reasonable care and prudence in the light of the then prevailing conditions. Certificate holders had instituted and threatened suits similar to the one at bar, but the present board believes the transactions complained of were properly made, and, in fairness to the stockholders generally, it should not spend large sums to prosecute such suit, the results of which would be doubtful. It is declared that the policy of Pennroad and its board in this and such other cases is not to assume an adverse attitude except to oppose efforts to dishonor the names or to question the performance of duties by its deceased and former directors or to impugn the good faith of its present directors and management.

The individual defendants in their respective answers defend on the ground that the claimants have shown no claim upon which relief could be granted, and aver that laches and the statute of limitations preclude any possible recovery; plaintiffs had not shown sufficient excuse for failure to demand that Pennroad bring suit in compliance with the requirements of the rules governing the bringing of secondary actions by stockholders, and that the complaint is defective in that it fails to allege bad faith of the present directors, or to aver personal interest accruing to the defendants by reason of the acts complained of. The answers further aver that Levi L. Rue, W. W. Atterbury and Richard D. Mellon are deceased. The answer of Joseph Wayne, Jr., avers also that he has been a director only since March 11, 1931, and did not participate in the matters complained of by the plaintiffs. The complaints in both of the pending suits being substantially the same, the admissions, denials, averments and separate defenses are accepted as responsive and form the basis of the issues in both cases.

The primary question suggested by an examination of the pleadings grows out of the relationship between Pennsylvania Railroad and Pennroad. If Pennsylvania was in a position to exercise domination and control over Pennroad and its investments, and did in fact dominate and control Pennroad's investments and operations, then certain fiduciary obligations devolved upon the Pennsylvania, the performance of which might make it accountable if losses were suffered. An appreciation of the issues must be based upon a review of the conditions which prompted the formation of Pennroad, its purposes, the plan of its organization and the actions of the parties responsible for its creation.

For many years prior to 1929 the Pennsylvania Railroad officers and directors believed that in order to extend their railroad's empire it must be prepared financially and otherwise to find a means of controlling other railroads, and that it was then necessary to start acquiring stock in the railroads the Pennsylvania Railroad desired to have in its system. Pennsylvania Railroad had begun investigations of and negotiations looking to acquisition of an interest in railroad properties which it desired, and the Pennsylvania Company, a wholly-owned subsidiary, then had under consideration the acquisition of the Detroit, Toledo & Ironton and the Pittsburgh & West Virginia Railroads. These routes had been allocated to other carriers in the tentative plan of consolidation of the Interstate Commerce Commission promulgated in 1921 pursuant to the requirements of the Transportation Act, 49 U.S.C.A. § 71 et seq. Pennsylvania wished to secure control of these railroads in order to preclude the possibility of their allocation to other systems. Pennsylvania officials had been negotiating for the purchase of Detroit, Toledo & Ironton since February, 1928, and had reached the final stage of negotiation on March 22, 1929, when Messrs. County and Ford signed a memorandum of understanding to the effect that Pennsylvania Railroad's subsidiary, Pennsylvania Company, would arrange for the purchase for $36,000,000, $15,000,000 of which was to be paid on April 30, 1929.

It was decided not to use the subsidiary, Pennsylvania Company, inasmuch as the Pennsylvania Railroad would be required to report to the Interstate Commerce Commission its railroad stock acquisitions and interests through the Pennsylvania Company. The officials of the Pennsylvania Railroad sought other means of acquiring the Detroit, Toledo & Ironton stock which would eliminate the necessity of reporting the acquisition to the Commission. They were also aware that the Clayton Anti-Trust Act, 15 U.S.C.A. §§ 12–27, made it hazardous for

596

the Pennsylvania Railroad or the subsidiary, Pennsylvania Company, to acquire control of other railroads where the effect might be to lessen competition.

Pennsylvania Railroad had also been interested in acquiring Canton Company and had been actively negotiating therefor but had discontinued because it deemed the price asked was excessive.

Beginning with an initial purchase of 10,000 shares of New Haven in 1904, Pennsylvania had by subsequent purchases increased its holdings in 1928 to 73,000 shares, and a Pennsylvania director had since 1906 served on the New Haven board. The subsidiary, Pennsylvania Company, had acquired stock of the Lehigh Valley and Wabash Railroads and it may be properly said that the Pennsylvania Railroad and its affiliates had been actively seeking means for extending its system and increasing its business through relationships with other lines.

Mr. County explained that railroad consolidations were being actively undertaken following the formulation of a tentative plan by the Interstate Commerce Commission in 1921 which was followed by three years of hearings. From 1924 to 1929 there was no definite plan under consideration and during that time the railroads themselves could not agree upon any plan. There arose serious questions by the Pennsylvania Railroad stockholders as to what was being done to protect their investment as against purchases of railroad interests then being made by other railroad companies. This question persisted in and out of the management and was deemed important. It was Mr. County's especial duty to be the guardian of the investments of Pennsylvania stockholders and he had continuously discussed with the directors what action the Pennsylvania could take to protect the interests of its stockholders, property and business relations with other roads.

They were aware that purchases of railroad securities were being made by other railroads and their subsidiary investment companies, but there seemed to be no protection available to anyone in respect to a consolidation or protective plan. The railroad did not have the ability to effect leases or consolidations because they could not be concluded without the consent of the Interstate Commerce Commission, and that Commission would not approve of consolidations because such consolidations would tie up the final plan when it should be adopted. The Pennsylvania stockholders and management were considerably disturbed by these conditions. Pennsylvania had also sought some suitable alignment or allocation of roads to Pennsylvania to protect the relations that had existed with other roads but without results.

Faced by this problem conferences were had with the bankers and officials of Pennsylvania Railroad who sought to work out a possible plan to utilize the Pennsylvania Company, an investment corporation whose stock was wholly owned by Pennsylvania Railroad. After full discussion, the conclusion was reached that the only satisfactory way to accomplish the purpose was through the incorporation of a separate investment company to be owned by the stockholders of Pennsylvania. In developing the plan, the bankers and Pennsylvania directors believed it desirable that the corporation should have the utmost liberty to engage in road, air and water transportation or shipping, and that broad charter powers should be provided. It was then decided to form a Delaware corporation and to extend to the Pennsylvania Railroad stockholders the right to subscribe the capital necessary to accomplish its purposes.

Complete arrangements for the formation of Pennroad were made by Pennsylvania officials prior to April 24, 1929. On March 27, 1929, Kuhn Loeb & Company submitted a plan for the formation of the new company and thereafter worked with Mr. County on the development of the plan. On March 28, 1929, Mr. County advised General Atterbury that "the situation may require formation of a new company which will develop fully and be ready about the end of next week", and on April 6, 1929, he submitted a further most illuminating memorandum stating, "I have considered some means of more adequately meeting our increasing corporate activities and financial interests by *supplementing* (italics supplied) the powers of the Pennsylvania Railroad and the Pennsylvania Company."

By April 17, 1929, the charter and by-laws had been prepared and a form of circular letter was under discussion. The following day a draft of the charter and by-laws was sent to Mr. Morris by Mr. County with the statement "for the protection of the company to prevent losing control, especially in the early days under a diversified ownership, a voting trust seems the only way * * *. The voting trustees would be our own people. The first directors of the corporation suggested would be our finance

committee, including General Atterbury and myself." Mr. County on April 23, 1929, instructed the Wilmington Trust Company to advance $21,050 to cover the filing fees in connection with the filing of the charter by the incorporating company and requested that this be carried as an advance to Mr. Lee.

With that background Pennroad was incorporated by persons officially connected with Pennsylvania on April 24, 1929 as an investment company with authorized capital of 10,000,000 no par value shares. The charter provided that the directors should be divided into three classes, each containing one-third of the board, and that at annual meetings only one-third of the directors would be elected for terms of three years. It provided that the corporation should not be required to make public or known to stockholders any statement concerning its assets or liabilities and the by-laws denied stockholders any right to inspect books except as conferred by law unless authorized by the board, the executive committee or the stockholders. The meeting of incorporators was held at noon on April 24, 1929, and Messrs. Atterbury, Morris, Ingersoll, Rue, Cooke, Mellon, County and Lee were elected directors. They were also directors of Pennsylvania and constituted almost the full membership of the finance committee of Pennsylvania. General Atterbury was president, and Mr. County vice president in charge of finance of Pennsylvania. At the first meeting of the board of Pennroad held on the same date, Mr. Lee was elected president, Mr. Ogden vice president and treasurer and Mr. Moyer secretary and assistant treasurer. Mr. Lee had been with the Pennsylvania for thirty years and was then treasurer, his superior officer being Mr. County. Mr. Ogden had been employed twenty-three years by the Pennsylvania and was serving in the treasury department under the supervision of Mr. County. Mr. Moyer had been assistant to the president of Pennsylvania. The board authorized the issuance of 5,800,000 shares of Pennroad stock to be placed under a ten-year voting trust with Messrs. Atterbury, Morris and Cooke as voting trustees. The certificates were to be offered at $15 and a proposed circular letter affording the stockholders of Pennsylvania the opportunity to subscribe to the voting trust certificates was approved at the same meeting, which letter was mailed to Pennsylvania stockholders on April 27, 1929.

The voting trust agreement dated May 1, 1929, recited that the stockholders deemed it for the best interest of the corporation and of the holders of the common stock that there shall be a continuity and stability of policy and management and to that end the voting trust should be created. The agreement provided that the voting trustees shall possess and exercise all rights and powers of absolute owners of such stock, including the right to vote for every purpose and to consent to any act of the corporation. The trustees were exonerated from liability for wrongful conduct, except individual malfeasance. The trust agreement provided for the election of successors by surviving trustees, and gave them power to propose amendments.

At the time of the organization of Pennroad, 67 shares were issued to the incorporators who were acting under the directions of the officials of Pennsylvania Railroad responsible for the formation of the corporation. These shares were transferred by the original subscribers to former employees of Pennsylvania, Messrs. Andrews, Hebden and Ogden, the latter having advanced the consideration. They were therefore the sole stockholders when the voting trust agreements were effected. The stock initially subscribed was later sold at a profit, and upon advice of counsel the profit was turned into Pennroad inasmuch as the subscribers were merely nominees.

Simultaneously and as part of the process of promoting Pennroad, there was prepared and sent to about 157,000 stockholders of Pennsylvania Railroad, introducing the new Pennroad, its plan of organization and purpose, and inviting subscriptions to its capital. These letters dated April 24, 1929, were sent out by President Atterbury of Pennsylvania Railroad and President Lee of Pennroad. In Mr. Atterbury's letter he stated *"Your directors* (italics supplied) have given earnest consideration to recent developments in the field of transportation and have reached the conclusion that it will be of material advantage to this company and to its stockholders, for the stockholders to unite in establishing a corporation so organized that it may make investments and take advantage of opportunities on a much broader basis than is possible under the limited powers of a railroad company. Your directors are of the opinion that such an independent instrumentality is needed to protect your interests and those of your com-

pany." This was followed by a statement of the incorporation of Pennroad.

Mr. Lee's letter declared that "in furtherance of the purpose for which the corporation has been organized and in order to secure continuity of management, all the stock now being issued will be placed in a Voting Trust, under which Messrs. W. W. Atterbury, Effingham B. Morris and Jay Cooke have consented to act as Voting Trustees." "The first board of directors of the corporation consist of" the seven persons named, "all of whom are directors of the Pennsylvania Railroad Company, and Mr. Henry H. Lee, the president of the corporation."

The letters directed that payment on subscriptions be made at the office of the Treasury Department of the Pennsylvania Railroad, Broad Street Station. The mailing was handled under the direction of 60 Pennsylvania Railroad employees and several hundred temporary assistants, and the expense amounting to $106,000 was advanced by the Pennsylvania and later assumed by Pennroad.

As subscriptions were received the shares were issued to the voting trustees who in turn caused the transfer agent to issue voting trust certificates to the subscribers. Warrants and certificates were quoted on stock exchanges after April 25, 1929, on a "when issued" basis and were admitted to unlisted trading privileges on the New York Curb, followed by a regular listing on June 17, 1929. Listings were also made on other exchanges.

Prior to the formation of Pennroad the officials of Pennsylvania Railroad had arranged underwriting commitments between Pennroad and the bankers, Kuhn Loeb & Company, which were set forth in an agreement consummated simultaneously with the incorporation and organization of Pennroad on April 24, 1929. The underwriting agreement provided that Kuhn Loeb should purchase 250,000 shares of the initial offering upon condition that 85% of the issue be subscribed by others. They were also granted an option to purchase 500,000 shares on or before July 1, 1932, in units of 125,000 shares at $16 to $19 per share. Total shares issued at that time were 6,050,000, and proceeds of $91,125,000. Kuhn Loeb took substantially all of its allotment at the times and prices fixed, during part of which time like certificates were being sold on the open market at upwards of $30, enabling them to resell their holdings at a profit.

On May 2, 1929 when certificates were selling on a "when issued" basis at $22, certain directors and officers of Pennsylvania were afforded the privilege of designating persons not Pennsylvania Railroad stockholders to whom an opportunity might be given to subscribe for Pennroad certificates at $15, to the extent of 100,000 shares. The directors and officers of the Pennsylvania submitted a list of names of subscribers including important officials and a number of important shippers. Mr. County declared "they were good traffic producers. They were friends. They were located right on the railroad." The preferred list subscribers were, however, finally limited to 23,963 shares because the volume of other subscriptions left only that number available. Some of the persons on the list refused to accept their reduced allotment, having sold their shares short, and thereafter Pennroad was induced to pay $22,255 to such persons in settlement of the losses they had sustained.

Prior to May 20, 1929, Pennroad had received no funds from the issuance of its stock. Meanwhile operations were financed by a loan of $500,000 effected on April 27, 1929 by the officers of Pennroad on a note without security and without prior authorization by the board of directors. The loan, however, was ratified by the board on April 29, 1929. The board also authorized the officers to borrow other large sums from banks identified as depositories of Pennsylvania, $15,000,000 of which was borrowed on April 29, 1929, without endorsements or collateral to enable Pennroad to make payment in that amount on account of the purchase of Detroit, Toledo & Ironton securities in accordance with the prior understanding had between the officials of Pennsylvania and Edsel Ford on March 22, 1929.

The facts, circumstances and elements entering into the formation of Pennroad are claimed by the defendants to establish a wholly independent investment corporation for the acts of which Pennsylvania Railroad is in no way responsible. The plaintiffs insist that it was an agency, adjunct or instrumentality of Pennsylvania Railroad designed and operated by Pennsylvania Railroad and its directors to serve the interest of the railroad, that it functioned as such and that the losses resulting to Pennroad investors must be charged to Pennsylvania Railroad. The collateral plans, negotiations, conferences and understandings between the parties involved are

important to a full appreciation of the problem and the relationship between Pennsylvania Railroad and the Pennroad.

It is significant that the three voting trustees were members of the Pennsylvania's finance committee and of its special committee on railroad consolidation, and that under the voting trust holders of trust certificates after once accepting the trustees, were precluded for a period of at least ten years from taking part in its management; nor could the agreement be amended or terminated by the voting trust certificate holders for such period. The purpose of this trust arrangement as explained by Mr. County was "for the protection of the company and to prevent losing control." This purpose was recognized by Mr. Percival Roberts, a Pennsylvania director, as a means whereby "the interests of the Pennsylvania Railroad may be protected" as indicated in his letter to Pennsylvania Railroad President Atterbury dated April 25, 1929, following the organization meeting. To this, Mr. Atterbury replied that "the voting trust * * * can be only for ten years, but before that time comes we can get some additional protection, such as convertible preferred stock, through which suitable control may be longer retained." From such statements it may be found that the purpose of the voting trust was to insure that for at least ten years the Pennsylvania Railroad could maintain control of Pennroad through the loyalty of its designated trustees and that Pennroad investors would be subjected to the will of trustee and directors owing their appointment and election to Pennsylvania. The only difference of opinion among the directors of Pennsylvania Railroad was as to the efficiency of the means of accomplishing that very purpose.

The plans of the officials responsible for the formation of Pennroad also included and provided for the designation and election of its directors and officers prior to the organization of the company. All of its original directors were officers or directors of Pennsylvania. General Atterbury was the chief executive, and Mr. County second principal executive of Pennsylvania, and were in a dominating position as members of the board of Pennroad. Messrs. Atterbury and County had long been in the services of and were paid by Pennsylvania. Messrs. Lee, president, and Ogden, treasurer, owed their appointments to their superior officials of the Pennsylvania with whom they had served for many years. Mr. Ogden was not consulted nor was he informed that he was to become Vice President of Pennroad until after his election. Judge Heiserman, vice president and general counsel of Pennsylvania, acted in the capacity of general counsel for Pennroad from the time of its organization, although he received no compensation as such until his retirement from Pennsylvania Railroad in 1932. After his retirement, his allegiance to the Pennsylvania continued inasmuch as he thereafter served as its special counsel at an annual salary. Judge Heiserman said that Pennroad "was at that time supposed to be a cooperative venture. Pennsylvania Railroad people organized it, certain officers organized the Pennroad Corporation, and as counsel for the Pennsylvania Railroad I was called from time to time to attend to any legal matters for the Pennroad Corporation just as other officers were * * *." "I was paid by the Pennsylvania Railroad and whatever I did for the Pennroad Company * * * was without pay from the Pennroad Corporation." The question naturally arises whether Pennroad, as an alleged "independent" corporation could actually be such under this arrangement.

The interlocking relationship of officers and directors was so set up that it had all of the potentialities of domination and control. Whether these directors and officers did or could insulate themselves from consideration of Pennsylvania's welfare as their primary objective and whether they acted wholly in the interest of Pennroad must be judged in the light of normal human experience. In view of the leadership by General Atterbury and Mr. County and acquiescence in that leadership by the others, it seems there is a clear inference of domination by the chief executive officers of Pennsylvania over the other directors and officers of Pennroad. The record indicates that those officers of Pennsylvania conceived the plan and designed the organization in the course of and fulfillment of their duties to Pennsylvania Railroad and that a large number of Pennsylvania directors received their first knowledge of Pennroad from the newspapers on April 25, 1929. Mr. Percival Roberts, long a Pennsylvania director, criticized the speed and secrecy surrounding the organization of Pennroad by the Pennsylvania Railroad officers and directors in two letters. He pointed out to President Atterbury at the

outset the inherent conflict of interests between the Pennsylvania in its managerial control of Pennroad, and the interests of Pennroad certificate holders, and recognized that the voting trust was adopted in order that "the interests of the Pennsylvania Railroad may be protected", because of the "necessity or desirability of expansion at this time to preserve the integrity of the Pennsylvania property." He questioned "the ability of the proposed instrumentality to accomplish its intended purpose" and made it clear that the representation of Pennroad as an independent instrumentality had no basis in fact. Mr. Roberts expressed the belief that the independence of such instrumentality would not long remain under the voting trust set-up, and that if a conflict of interest should arise between the management and certificate holders, the courts would in all probability sustain the stockholders. Referring to the directors' meeting of April 24, 1929, he declared "frankly I am disappointed that such a situation arose as we had yesterday. For a large number of your directors to obtain their first information concerning the organization of so important a project as the proposed Pennroad Corporation from a reasonably correct detailed report in the public press savors too strongly of the rubber stamp to be palatable. * * *"

"The proposed corporation is separate and distinct from Pennsylvania Railroad, but organized for the purpose of enabling investments to be made for the benefit of the latter company, which it cannot legally accomplish in its own name * * * that the interests of the Pennsylvania Railroad may be protected, a voting trust is proposed for a period of ten years, the first trustees nominated being officials of the Pennsylvania Railroad Company. * * *

"If the purposes of the company are of a temporary nature so that the company's assets can be distributed and the corporation dissolved prior to the termination of the voting trust, well and good, but suppose * * * the voting trust is terminated and the shareholders of the Pennroad Corporation take over the management of their property without regard to the interests of the Pennsylvania Railroad Company." Mr. Roberts further declared, "I make no criticism as to the necessity or desirability of expansion at this time to preserve the integrity of the Pennsylvania property. I only question the ability of the proposed instrumentality to accomplish the intended purpose. * * * Your directors are of the opinion that such an independent instrumentality is needed to protect your interests and those of your company * * * and in order to insure continuity of management, all of the stock now being issued will be placed in the voting trust. * * *"

These expressions confirm the impression that the promotion was primarily undertaken by and on behalf of Pennsylvania Railroad and that its officers did not proceed in ignorance of the dangerous possibilities. The chief executives were put on notice that there was a fundamental vice in the scheme, and that their object of obtaining control of railroad properties by such means for the benefit of the Pennsylvania could not be attained without the sacrifice of the conflicting interests of the Pennroad and its certificate holders.

The defendants have, throughout the litigation, insisted that a distinction be made between the Pennsylvania Railroad and the stockholders of Pennsylvania Railroad, and that an important difference exists between serving the purposes of the stockholders and serving the purposes of the railroad so far as the legal effect of the actions here involved are concerned. The evidence, however, shows beyond doubt that members of the governing board and official management of Pennsylvania Railroad had recognized the necessity and conceived the plan of expanding the realm of the Pennsylvania Railroad which included as an essential element the organization of Pennroad. That the Pennroad was created as an instrumentality to achieve the desired ends sought by the railroad is confirmed by the Pennsylvania Railroad's letter to stockholders advising them of the conclusion reached by *their* directors that a material advantage to *their* company and its stockholders would result from the formation of Pennroad with the view to making investments not legally possible under the limitations imposed upon railroads. The opinion was further expressed in the letter that such corporation was an independent instrumentality necessary to protect the interests of the stockholders and the railroad in the matter of railroad investments.

It is conceded by the officials of Pennsylvania Railroad that their company did conceive Pennroad and that they did resort to this instrumentality, whether described as controlled or independent, to avoid reporting to the Interstate Commerce Commission

purchases or options on other railroad properties or securities. Mr. County acknowledged this fact but explained that he had considered the matter from another angle. He felt that the use of Pennroad would eliminate the waste of time incident to securing approval of stockholders every time any action was taken. He believed, however, that the formation of Pennroad was necessary because of its ability to engage in those forms of investment and transportation which were not within the power of the railroad because of the curtailments or restrictions of the Acts of Congress and state legislatures upon the railroad's freedom of action in the desired fields of investment.

It seems obvious therefore that the Pennroad was designed and organized primarily to serve such purpose of the Pennsylvania Railroad, which was in effect the parent company, in spite of the fact that it had no financial investment in Pennroad. The benefit was intended to be derived through a purported independent instrumentality but which was in fact a creature of Pennsylvania Railroad whose operations would be carried on in violation of the national policy of Congress as embodied in the Transportation Act. It was designed to be used by Pennsylvania Railroad to circumvent the jurisdiction of the Interstate Commerce Commission and in effect nullify the system of railroad regulations established under the legislative acts of the Congress.

Pennsylvania Railroad was in a position to dominate Pennroad as completely as it was able to control its wholly-owned subsidiary, Pennsylvania Company. By reason of the voting trust arrangement, the interlocking directorates, the designation of official and subordinate personnel and their long history of loyalty to Pennsylvania Railroad service and purpose out of which the plan evolved, Pennsylvania Railroad was given, as a practical if not technical matter, full and complete power over the policies, investments and other acts of the Pennroad Corporation. The exercise of such control is demonstrated in many instances and particularly in several transactions not complained of in this suit. In the matter of Universal Fruit Company, Pennroad, at the suggestion of the railroad officials who were also directors of Pennroad, made two loans without prior authorization of the board, the acknowledged purpose of which was to benefit the railroad by accom-

modating its shippers in the interest of retaining their good will and freight business while the risk was borne entirely by Pennroad. A like accommodation was granted by Pennroad to the Gerrard Company for the same purpose, and when the loan went bad it was taken over by a Pennsylvania Railroad wholly-owned subsidiary. Pennroad also purchased Raritan Railroad stock at $150 per share. It was acknowledged that Raritan constituted a valuable feeder line to Pennsylvania Railroad, which had been the subject of negotiations for purchase by Pennsylvania Railroad, that the purchase was made to improve Pennsylvania Railroad's competitive and consolidation position and that Pennroad intended to sell its interest therein to Pennsylvania Railroad. This purpose was not accomplished, however, because the Central Railroad of New Jersey bought the controlling interest in Raritan and blocked Pennsylvania Railroad's plan to obtain control. Pennroad's holdings of Raritan stock were sold to other purchasers at a profit, but it is believed that these transactions clearly demonstrate the actual operation of Pennroad in the interest of Pennsylvania Railroad without regard to the risks involved, and that Pennroad was actually an operating instrumentality of Pennsylvania Railroad and not independent in any accepted sense of the term.

The matters which more clearly than all others typify and characterize the relationship that existed demonstrate the potential and actual domination and control, the plans and purposes of Pennsylvania Railroad, and the fact that Pennroad was not an independent investment project but merely an agency or instrumentality of Pennsylvania Railroad, are the National Freight transactions.

It is charged that Pennsylvania Railroad caused and induced Pennroad to engage in the forwarding business for the Pennsylvania Railroad upon the advice of the railroad officials; that the forwarding company had been originally planned and designed to meet the freight traffic problem which then confronted the railroad and that the forwarding company was organized and did operate wholly as a subsidiary of Pennsylvania Railroad. As a result its operation was at the sole cost, risk and loss of Pennroad, while at the same time Pennsylvania Railroad enjoyed the benefits of the freight traffic produced and the rentals of its facili-

ties. It is contended that the forwarding company promotion and operation constituted a fraud upon Pennroad and its certificate holders in that they were conceived and carried out in reckless and wanton disregard of Pennsylvania Railroad's duties and obligations as a fiduciary and that the individual defendants participated in its perpetration. Defendants' denial of the charges rests solely upon the contention that the freight forwarding project held prospects of profit to the Pennroad and its certificate holders which justified the venture as an independent investment of Pennroad in a promising field of business.

In the spring of 1929, Pennsylvania Railroad management had become convinced that a crucial condition then existed with the "less than carload" traffic business of the railroad. The chief executive believed it indispensible for the railroad to own or control a freight forwarding company which would operate in the Pennsylvania Railroad territory. The problem had become urgent because the New York Central had acquired a controlling interest in U. S. Freight Company which carried with it the control of the Universal Freight and thereby disrupted the plans of Pennsylvania Railroad for a national cooperative forwarding company. They deemed it essential to immediately put into the field a forwarding company operating under the auspices of Pennsylvania Railroad in order to offset the competition of New York Central operating through Universal Freight and to forestall the prospective competition of other forwarding companies operating with other railroad lines.

On May 13, 1929, Vice President Deasy in charge of operations of Pennsylvania Railroad at the instance of Mr. Clement proposed a plan for getting the railroad into the forwarding business by suggesting that a company be formed to purchase forwarding companies not associated with the U. S. Freight, and that it be financed by the sale of stock to railroads having a common interest. After further consideration of the plan and necessities, Mr. County on May 28, 1929, asked Mr. Clement to have a study made of the problem with the view to taking action immediately if the forwarding companies in the territory would not cooperate or if the prices asked for interest of such concerns continued to be excessive. On June 6, 1929, Mr. Clement submitted the outlines of a plan for the formation of a new forwarding company to be formed and financed by Pennsylvania Railroad. It stated that the railroad departments interested had agreed upon the name National Freight Company and contemplated that the Pennsylvania Railroad through its subsidiaries or affiliates should own all of the stock representing an anticipated capital requirement of about $800,000.

This plan had of course come to the attention of Pennsylvania Railroad's general counsel, whereupon Mr. County received a specific direction that the Pennsylvania Railroad must be kept out of the freight forwarding business until the way was clear with the Interstate Commerce Commission. The subsidiary, Pennsylvania Company, was likewise disqualified to act and a substitute was sought. Messrs. Atterbury, County and Deasy, however, believed that means could be found to meet the legal obstacles and to enable the railroad to organize, direct and control a freight forwarding enterprise. Mr. County proposed to Mr. Atterbury, and it was agreed, that Pennroad should take over the freight forwarding program instead of Pennsylvania Railroad or its subsidiaries; that the railroad should furnish the necessary experts to take charge of the business and that the railroad officers would serve as directors of the forwarding company.

The Pennroad board considered the matter on June 12, 1929, and determined that the formation of a freight forwarding company whose stock would be held wholly or in part by Pennroad was necessary and desirable especially for the eastern railroad territory. They authorized the officers to proceed with the formation of the National Freight and designated Messrs. Morris, Cooke and County as an executive committee to accomplish that purpose. The company was formed in August 1929, and purchased the stock of the forwarding firm, G. W. Sheldon & Co., and the business of the Judson Freight Forwarding Company. Prior thereto Mr. Strohm, the expert chosen to head National Freight, advised the directors that keen competition from Universal Freight would be encountered at the outset and that in order to meet such competition, National Freight must be in a position to begin business with service at all points where Universal Freight operated. The initial investments contemplated the acquisition of twenty-one stations as against fifty of the competitor. The establishment of other stations would be costly and it appears that it could not be expected that

profits would be made for a long period and until a satisfactory competitive position was established.

Throughout its operations, National Freight suffered increasing deficits. It ceased operations in November, 1931, at which time it sold all of its assets and good will to National Carloading Company for the stock in that company. The latter company was formed by taking over the National Freight, Standard Carloading (a Van-Sweringen Company), and Commerce Freight (a Wabash Company) companies and involved an understanding that those companies should respectively control the distribution of certain percentages of the forwarding traffic over railroads of their respective choices. Pennroad advanced an additional $500,000 to National Freight in effecting the consolidation and financing operations of the new National Carloading Company. Thereafter in 1933 National Freight sold all of its interest in National Carloading for notes in the amount of $400,000 of Standard Carloading, which notes were liquidated for $381,000.

Although it is contended that the Pennroad's investment in National Freight was a sound and proper one justified by its prospects of profit, and that only as an incident thereto would the Pennsylvania Railroad be benefited, Messrs. County, Lee and Ogden agreed that a further justification was to be found in the fact that Pennsylvania Railroad and Pennroad believed and acted upon the belief that Pennroad had been created and formed to further the interests of Pennsylvania Railroad; and by reason of the fact that the promotion of a forwarding business fits into the purpose of benefitting the railroad and its stockholders, it is logical to assume that Pennroad would make investments in line with the object of its creation. Coupled with the fact that the National Freight venture was taken up because of its urgent necessity, it would seem that the acknowledgment of Mr. Lee that "the enterprise was undertaken upon the advice of the railroad officials" concedes the venture to be a primary one for the Pennsylvania Railroad. Mr. County further stated that the necessity referred to was the necessity to hold the traffic and services on the Pennsylvania Railroad lines.

These circumstances coupled with those relating to the formation of Pennroad lead to the conclusion that Pennroad's part in the freight forwarding business was not in fact, nor was intended to be, that of an investor. In contrast it was more in the nature of an agent or instrumentality of the railroad carrying on for and on behalf of the railroad a project which the railroad could not then undertake for itself. There was an intention on the part of the railroad to enter into the business itself, followed by the adoption of the more expedient plan of using Pennroad, and later by the declared intention to take over the forwarding business from Pennroad. From all of these facts there is an inference and belief that the enterprise was deemed to be a direct Pennsylvania Railroad project and that the railroad expected and intended to take it over from Pennroad as soon as the legal obstacles had been removed. Such impression is supported by the insistence of Messrs. Lee, Ogden and County from the beginning that Pennsylvania Railroad had a distinct moral obligation to Pennroad in connection with the undertaking and that such moral obligation required Pennsylvania Railroad to relieve Pennroad of its burden and to take it over as a railroad project. Mr. County believed it possible that through some subsidiary, Pennsylvania Railroad could take it off Pennroad's hands and he exercised all his force and influence toward that end. He expressed the belief that had there been no legal obstacles, Pennsylvania Railroad would have directly started the freight forwarding enterprise in the first instance, and that if such difficulty had not continued it would have extricated Pennroad by taking over, if not because of legal compulsion, certainly because of the moral duty.

Messrs. Lee and Ogden agreed that Pennroad had a moral right to demand that the railroad find a way to take over the proposition and to save Pennroad from its losses. In connection with the negotiations for the disposal of National Freight, Mr. Lee declared, "I feel that the Pennsylvania Railroad has a distinct moral obligation to Pennroad in connection with the National Freight enterprise because it was undertaken upon the advice of Pennsylvania Railroad officers who were convinced that it would prove a paying venture, so that a favorable attitude and action by Pennsylvania Railroad to help a new and efficient management * * * would be of great value to us and cannot fail to help Pennsylvania Railroad". Mr. Ogden seemed especially to feel that Pennroad's investment in the forwarding business was made for the benefit and under the domination of the railroad, that it had

done so to help get business for Pennsylvania Railroad and that the organization of National Freight had actually been accomplished by the railroad officials.

Such acknowledgments deny the claim that the Pennroad's interest in the freight forwarding business was or was ever intended to be a bona fide investment—even with the qualification that investment might also take into account an incidental benefit to the Pennsylvania Railroad. Their recognition of a moral obligation could only be based upon a knowledge that the circumstances under which the venture was made, and its acknowledgment negatives any impression that it constituted an investment.

In March, 1930, about two months after National Freight began to operate, President Atterbury of Pennsylvania Railroad advised the Pennroad directors that his company desired and intended to take over the National Freight when it could find the means to do so. Mr. A. H. S. Post, a Pennroad director elected March 1, 1930, had questioned the propriety of making further advances to National Freight. Mr. Post was an independent director elected to represent non-Pennsylvania Railroad stockholders. Upon receiving assurances from Mr. Atterbury that the freight company would be taken over by the railroad and that it was seeking to accomplish that purpose, he and the other directors agreed to make further advances. This attitude of the officials and the declared intentions, whether or not they were conditional upon the finding of means, is inconsistent with and repugnant to the contention that Pennroad had organized and operated the National Freight as a bona fide permanent investment of its capital for the benefit of its investors. It is more in keeping with the theory that Pennroad was acting as a substitute for the railroad, and its interim instrumentality, to carry out the railroad's plan and program for such time as the railroad needed to arrange a legal program for its direct participation in that business.

The fact that National Freight was operated and considered as an adjunct of Pennsylvania Railroad is evidenced by the background and purpose, but it is also shown by the fact that the nucleus of the business was acquired at a price representing the traffic valuation as distinguished from an investment valuation based upon earnings and prospects. It was intended that the company should become an agency through which Pennsylvania Railroad could counter the competition of other roads and forwarding companies. It undertook to match the number of the stations operated by its competitors and planned to do so in spite of the prospective losses incident to the development of such competition and the amount of capital required. Mr. Strohm reported that the company was "meeting the cut rates of our competitors and in addition are opening new stations and inaugurating new services which at the start must show a loss". Indeed it would seem that the losses of the freight forwarding business were due largely to the so-called cut throat competition, which was described as one of the hazards of the business, and to the necessity for rapid and costly expansion, and not only to the depression as contended by the defendants. The losses and burdens resulting from competition and expansion can be attributed to the fact that National Freight was the instrumentality by means of which Pennsylvania Railroad sought to protect its "less than carload" freight, inasmuch as the competition between Universal Freight and National Freight was in effect the competition between New York Central through Universal and Pennsylvania Railroad through National.

It is clear therefore that National Freight was formed and entered the field primarily to compete with Universal. It was in character, and so far as Pennroad was concerned, no more than a business venture in a comparatively new and highly competitive field and subject to all the hazards and chances of success or failure attendant upon business ventures generally but with a possible speculative element not common to all. It was or should have been known by Pennroad directors that in competition between a commercial freight forwarding company dependent wholly upon profit from combining "less than carload" freight shipments, and a railroad operated freight forwarded earnings profits from such freight shipments and also from transportation generally, the latter company had a material advantage.

The National Freight began with what now appears to have been an insurmountable handicap. But without too great emphasis upon hindsight, it can also be said that the conditions and surrounding circumstances with which the directors were faced in 1929 did not justify them in entering into the freight venture as a sound investment or even as a good investment with the incidental purpose of collateral benefit to the Pennsylvania Rail-

road. Their action constituted the establishment of an instrumentality directed and intended to serve the interests of Pennsylvania Railroad by enabling it, indirectly and by subterfuge, to engage in the freight forwarding business at the sole financial risk of the investors in Pennroad contrary to the policy of the law, and secondarily, with the view and the hope of benefitting the investors by means of increasing the earnings on the Pennsylvania Railroad and Pennroad stocks held by them. The plan devised and executed by the defendants had all the potentialities and actually did accomplish the domination by Pennsylvania Railroad and the subservience of Pennroad to the loss and detriment of its certificate holders.

A review of the evidence shows the existence and effect of the Pennsylvania Railroad domination in all of the other transactions complained of and the interests of Pennsylvania Railroad which were sought to be served. The D. T. & I. purchase was made in pursuance of negotiations undertaken on behalf of the Pennsylvania Railroad at a time when the subsidiary, Pennsylvania Company, was intended to be used. The same officials decided to "use Pennroad" to accomplish the same purpose, they formed Pennroad hastily and within the time specified for consummation of the purchase in the memorandum of understanding made March 22, 1929, and arranged for loans to the new company to make the purchase prior to the subscription and payment of any of its capital stock. That the purpose of the purchase was to bring the D. T. & I. within the realm of influence and operations of Pennsylvania Railroad is equally clear in spite of the contention that such purchase was merely an investment of Pennroad funds which might also be expected to benefit Pennsylvania Railroad. The D. T. & I. was in a peculiarly advantageous position to claim the Ford traffic and formed an almost indispensable link in the territory through which the Pennsylvania Railroad trunk lines operated. It was deemed essential by Pennsylvania Railroad to the protection of its business and its competitive position with regard to freight and also in the matter of consolidations. Evidence that Pennroad served the purpose of the railroad primarily is found in the fact that pursuant to the negotiations previously had, it paid substantially more than the Pennsylvania Railroad of-

ficials had believed D. T. & I. was worth and upon terms which did not include an assurance of Ford traffic which the railroad officials had felt was indispensable.

It therefore seems obvious that in their anxiety to acquire the advantages to Pennsylvania Railroad which would result from effectively bringing D. T. & I. into the control of Pennsylvania Railroad, its officials caused Pennroad to purchase at what they had previously felt was an excessive price and upon terms not then acceptable to them, thereby imposing upon Pennroad the sole risk in the venture while assuring Pennsylvania Railroad of all of the advantages which would accrue from the acquisition.

The evidence further discloses that the acquisition by Pennroad of interests in other railroad properties and securities was by the same process and for like purposes. Without unduly extending these comments it may be noted that the purchase of the Canton Company and the stock of the Pittsburgh & West Virginia were made in pursuance of previous considerations and plans of Pennsylvania Railroad for acquiring those railroads with the view to increasing its business, strengthening its position in the matter of consolidation, and precluding the possibility of competitors acquiring them. The investments of Pennroad in the Seaboard Airline, Lehigh Valley, New York, New Haven & Hartford, and Boston & Maine were likewise prompted by Pennsylvania Railroad with the view to furthering the interests and extending its sphere of influence for the purposes described. It is apparent also that in such transactions there appears to have been an appreciation that the risk would be undertaken by Pennroad alone although substantial benefits would accrue to Pennsylvania Railroad. The prices paid were deemed less important to Pennroad than to the Pennsylvania Railroad for Pennroad paid more than the railroad was willing to pay for the same assets after complete studies of their values to the railroad. All of these purchases and investments were made at the instance of the Pennsylvania Railroad acting through its officials who were also connected with and charged with the affairs of Pennroad and who recognized that Pennroad had been formed to accomplish what the railroad could not do in its own right and in its own name, and to make in-

vestments to the benefit and advantage of Pennsylvania Railroad.

This summary of the facts and circumstances as evidenced in the voluminous record of the case is sufficient to suggest the essential elements upon which the primary issues are based. There remain to be determined the issues as to the exact relationship of the defendants to the complainants and the duties arising therefrom, whether the conduct of the defendants constituted fraud, conspiracy or a reckless disregard of their duties, and what equitable redress, if any, should be granted.

■ There can be little doubt that Pennroad was created in pursuance of a carefully designed deliberate plan to form an organization, technically independent, which would operate as an agency or instrumentality of the Pennsylvania Railroad for the purpose of controlling railroads or their securities contrary to the federal and state laws and regulations applicable to railroads and their acknowledged subsidiaries. The participants were the defendant interlocking directors of Pennroad and Pennsylvania Railroad, the railroad and its officials and managers who were also officers, directors and voting trustees of Pennroad. The Pennsylvania Railroad was a party not only because of the participation of its officials but also by reason of the fact that its official board at the April 24, 1929, meeting stated of record "that it is the sense of this board that the purposes and objects of the said new corporation are in the interests of this company" and clearly acknowledged its part and adoption of the acts of the individuals involved.

■ The Pennsylvania Railroad corporation, although a legal entity theoretically incapable of intentionally wrongful or ultra vires acts, is moved and operated by human beings, and when they, acting as the agents or officials of the corporation and within the scope of their duties and on the corporation's behalf, enter into a combination or agreement to serve its purpose, the corporation may not deny the legal liability arising therefrom.

There was therefore a combination of persons, including officials of the railroad acting in the course of their duties, intentionally participating in the furtherance of a preconceived common design, with the mutual understanding that such plan was intended to thereby enable the Penn-

sylvania Railroad to circumvent the legal limitations upon the railroad in the acquisition of interests in other railroad properties. There was a collusive combination, an agreement as to the means and objectives, and an intent to evade the spirit and the restrictions of legislative enactments.

■ The combination of the defendants so formed and operated did in fact exercise the power of management of Pennroad and thereby assumed a fiduciary relationship to the company and its certificate holders. The latter, although not actually the holders of stock certificates, were in the position of stockholders except for the existence of the voting trust, and must be treated and recognized as the actual stockholders for the purposes of this case. It has been held that majority stockholders having the right and power to control occupy a fiduciary relation toward the minority to the same extent as the corporation or its officers and directors. Southern Pacific Co. v. Bogert, 250 U.S. 483, 487, 39 S.Ct. 533, 63 L.Ed. 1099. "A combination of the holders * * * of the stock of a corporation to elect directors, to dictate their acts and the acts of the corporation for the purpose of carrying out a predetermined plan places the holders of such stock in the shoes of the corporation and constitutes them actual, if not technical trustees for the holders of the minority of the stock. The devolution of power imposes correlative duty." Jones v. Missouri-Edison Electric Co., 8 Cir., 144 F. 765, 771.

It was said in Chicago, Milwaukee & St. Paul R. R. v. Minneapolis C. C. Ass'n, 247 U.S. 490, 38 S.Ct. 553, 557, 62 L.Ed. 1229, involving the management of two railroads by a third through stock ownership, "where stock ownership has been resorted to * * * for the purpose * * * of controlling a subsidiary company so that it may be used as a mere agency or instrumentality * * * the courts will not permit themselves to be blinded or deceived by mere forms of law but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require."

■ The principle of fiduciary relationship and obligations is not only applicable to control exercised by majority stockholders. "The relation of directors to cor-

porations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously by the law as are personal dealings between a director and his corporation." Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 599, 41 S.Ct. 209, 212, 65 L.Ed. 425.

There is a tendency to look beyond the corporate forms to the purpose of the corporate acts and the officers identified with that purpose (McCaskill v. United States, 216 U.S. 504, 514, 30 S.Ct. 386, 54 L.Ed. 590) for it has been held that a "corporation which actually induces management action in its subsidiary will be treated itself as manager, and will be made subject to all the fiduciary obligations toward the subsidiary which are imposed on corporate directors themselves." (Blaustein v. Pan American Petroleum & Transp. Co., 174 Misc. 601, 21 N.Y.S.2d 651, 712); and will be held liable for mismanagement of the subservient corporation through interlocking directors. Bernheim v. Louisville Property Co., 185 Ky. 63, 214 S.W. 801. Pennsylvania Railroad by reason of the interlocking directorates, the placing of its officers in key positions, and the creation of the voting trust device, was in as complete control of Pennroad as if it owned a majority of the stock. The existence of control is the important consideration, and not the means adopted, which creates the fiduciary relationship and the exercise of such control, regardless of the device employed, which fixes the liability.

The creation of Pennroad and the direction of its activities in the interest of preserving and extending Pennsylvania Railroad freight traffic and improving its position as a system were carried out for the primary benefit of Pennsylvania Railroad, in spite of its legal duty to administer the affairs of Pennroad solely in the interest of the certificate holders, although it might be conceded that such administration could also take into account the incidental benefits to Pennsylvania Railroad. The rule is well settled that one in a fiduciary position may not make any profit out of his trust. His duty is to protect the interests of the estate and not to permit his personal interest to conflict with those duties in any respect. "The intention is to provide against any possible selfish interest exercising an influence which can interfere with the faithful discharge of the duty which is owing in a fiduciary capacity. * * * It makes no difference that the estate was not a loser in the transaction." Magruder v. Drury, 235 U.S. 106, 119, 35 S.Ct. 77, 82, 59 L.Ed. 151. The rule is based upon the moral obligation of a fiduciary to refrain from placing himself in a position which would excite a conflict between self-interest and integrity or duty; and the law provides against the probabilities and danger that the self-interest might exercise a predominant influence and might supercede that of duty.

The application of such principles has been demonstrated in numerous cases, but in only a few of these are there found analogies of facts and circumstances helpful to the present problem. Such a case is Brown v. Pennsylvania Canal Co., D.C., 229 F. 444, ·452, affirmed, 3 Cir., 235 F. 669, in which Pennsylvania Railroad was charged with having caused the diversion and application of certain moneys of the sinking fund of the Canal Company in such manner as to benefit the Pennsylvania Railroad, although there was no evidence that the railroad had by any corporate action done anything to control the administration of the sinking fund. The Pennsylvania Railroad was held liable, however, in an opinion which declared, "Every corporate act, except such as those which are performed through parliamentary forms of procedure, is done through and by some person or persons. When such persons are acting for the corporation, the only direct evidence which can be had of that fact is their own declaration, or a recorded resolution of its board of directors. If the persons have like relations to two or more corporations, this truth is emphasized. Their corporation, or, if they were connected with two or more, either or any of them, might be found from all the evidence to have done what was done. If the individuals * * * had themselves profited by what they did, as the railroad company has profited, they would certainly be held to the finding that they as individuals controlled their actions as officials. How, then, without throwing away substance for shadow, can we refuse to make a like finding against a corporation under like facts and circumstances? If an individual * * * acts so that moneys which should have gone to the corporation go to him, he is liable to account for the unlawful gains. Why should not the same inferences, upon which this lia-

bility is based, be found against one of two corporations similarly placed? The basis of the finding is not bad faith, but it is an inference required to be drawn by a policy of the law, which, in turn, is based upon hard common sense. No man can serve two masters, and when he is in the service of two nominal masters whose interests conflict he is presumed to have acted for that one who is found to have been the real master." The U. S. Circuit Court of Appeals for this District approved this reasoning in clear unmistakable terms.

The Brown case is important because of the striking similarity of the facts to those of the present case. There the railroad had acquired a railway and a canal running side by side. Its managers formed a canal company to overcome a deficiency in its corporate powers and sought to provide against the possibility of the Canal Company falling into hostile hands. Such possibility was precluded by the fact that the railroad owned all of the Canal Company's stock, and by reason thereof created an interlocking directorate and caused the selection of friendly officers, managers and the trustee of the mortgage securing the bonds, the latter being the president of the railroad. The Canal Company was thereby operated and managed in pursuance of the railroad's plan and on its behalf. Here Pennroad was formed by the Pennsylvania Railroad to avoid the restrictions of the I. C. C. rules, its plan, although not involving stock ownership, was equally effective by reason of its chosen voting trustees, the interlocking directors and the friendly management. In neither case was there any direct evidence that the railroad had taken any corporate action with regard to the other companies, yet in the canal case it was held in effect that when a subsidiary corporation does something for the benefit of the parent corporation which has the power of control, it may be inferred that the parent corporation caused the act to be done.

The occupation of two positions imposing different obligations at once raises a conflict of interest and duty and, due to the known weaknesses of human nature, it is to be expected that in a majority of cases duty would be the loser in the conflict. The danger of permitting a collision between personal and fiduciary interests is the foundation of the rule which holds a person occupying a dual position to the strictest accountability to his trust. As said by Justice Cardozo (Wendt v. Fischer, 243 N.Y. 439, 443, 154 N.E. 303, 304), "The law 'does not stop to inquire whether the contract or transaction was fair or unfair. It stops the inquiry when the relation is disclosed * * * without undertaking to deal with the question of abstract justice in the particular case.' * * Only by this uncompromising rigidity has the rule of undivided loyalty been maintained against disintegrating erosion."

The same Judge in Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546, 62 A.L.R. 1, declared that "many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. * * * Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd".

The court's uncompromising adherence to the rule of undivided loyalty "does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation. * * * a constructive trust is the remedial device through which precedence of self is compelled to give way to the stern demands of loyalty." Guth v. Loft, Inc., Del.Sup., 5 A.2d 503, 510. "The rule is based upon the public policy of removing temptation completely from the office of a fiduciary, so that it will not be necessary to determine whether it was the interest of the trustee or his sense of duty which prevailed." Blaustein v. Pan American Pet. & Transp. Co., supra.

The circumstances and issues presented in Bernheim v. Louisville Property Co., supra, [185 Ky. 63, 214 S.W. 803], are in many respects analogous to the present case. There a derivative action was brought by a stockholder of the Property

Company charging that its affairs had been managed for the benefit of the Louisville & Nashville Railroad and seeking to compel the directors of the railroad to account. The railroad had acquired real estate for expansion and traffic reasons but deemed it inexpedient to take title in its own name. It organized the Property Company which was operated as an adjunct of the railroad. Later there was a severance in the course of which additional capital stock of the Property Company was issued to the railroad. The latter then distributed the entire capital stock of the Property Company among the railroad stockholders. The railroad thereby ceased to be a stockholder of the Property Company and that company then appeared to be a separate entity. By reason of the fact that Atlantic Coastline was a majority stockholder of L. & N. Railroad, the Atlantic Coastline became a majority stockholder of the Property Company also and as such elected directors of the Property Company chosen entirely from the officials of L. & N. The situation is somewhat analogous to the present case in that the railroads in both cases had no stock interests in the servient, though apparently independent companies. The Louisville & Nashville and the interlocking directors of the Property Company were, however, held liable to account for the transactions which took place subsequent to the severance of the companies. After a full review of the facts, the court covered many of the points applicable to this case in the following language:

"The conclusion is unescapable that this whole transaction was engineered and put over by the directors and officers of the property company, who were also officers in the Louisville & Nashville Railroad Company, in order that that property might still be available throughout the 20 years or longer to the railroad company as and when that company needed it * * * this transaction but fitly illustrates the inability of any man or set of men, however upright and well meaning, to serve two masters at the same time, and that fact is not only exemplified by this transaction, as well as some of the evils of interlocking directorates, but is also the most patent fact in all the testimony of Mr. Mapother, who for years has attempted the difficult rôle of serving at the same time as vice president of both of these companies, whose interests since their legal severance

in 1908 have been almost diametrically opposed to each other. * * *

"Nearly, if not all, of this property was unprofitable as an investment, and certainly ought to have been sold * * *. The Louisville & Nashville Railroad Company, on the other hand would need this property, or much of it, as its business developed; and, although it now owned no interest in and had no right to control the policies of the property company, it was patently to its interest that this property should be left where the Louisville & Nashville could get it as it needed it. And this is exactly and all the Cairns transaction did or was intended to do, and this was thoroughly understood by all parties at all times, as is clearly apparent by their subsequent acts * * *.

"Mr. Mapother, as was not unnatural, knowing the real purposes and effect of the Cairns arrangement, shows by his testimony the utter inability of himself and his associates to lose sight of the fact that the property company was organized and acquired its property for the sole purpose of serving the interest of the Louisville & Nashville Railroad Company, or to believe the severance of 1908 in reality changed the relationship between the two companies * * *."

There, also, the defendants argued that as to the complainant there was "an estoppel to his objecting to the property company being managed in the interest of the railroad company" because he "knew that the property company was organized and its property acquired to serve the purposes of the railroad company."

The court further declared that the circumstances show conclusively that the directors "have believed and acted upon the belief that it was their duty to manage the property company in the interest of the railroad company; and because of this belief these directors, who are men of unimpeachable character and integrity, have nevertheless and without corrupt motives or profit to themselves utterly misconceived their duties as directors in the property company, and as a consequence their management of its affairs in the interest of the Louisville & Nashville Railroad Company has been and is a fraud upon the rights of all the minority stockholders in the Property Company, who did not happen to be also stockholders in the Louisville & Nashville Railroad Company."

In this instant case also the directors, who are men of unimpeachable character and integrity, acting in the interest of serving their companies, have misconceived their duties toward the Pennroad certificate holders, and have created instrumentalities by means of which risks and losses were passed on to such holders in the process of serving Pennsylvania Railroad. Fiduciaries who breach their trust may be held accountable regardless of whether they are individuals or corporations and whether or not they act directly or through control of a separate instrumentality or other means. The instrumentality rule "is not, properly speaking, a rule, but a convenient way of designating the application, in particular circumstances, of the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when so to do would work fraud or injustice. This principle has been applied in appropriate circumstances to give minority stockholders redress against wrongful injury to their interests by a majority stockholder." Justice Roberts in Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 322, 59 S.Ct. 543, 550, 83 L.Ed. 669. It would seem that such rule would be equally applicable where a breach has been committed through and by means of a separate corporation.

As was said in the Blaustein case, supra, "The plaintiffs had the complete burden of proving this relationship as part of their case, as in any case where a party relies upon the existence of a confidential or trust relationship * * * but once that trust relationship was established, a burden was at that moment placed upon the trustee to justify certain of its actions—a burden of proof, and not merely a burden of going forward with evidence. The transactions for which the defendants * * * have the burden of justification are those which resulted in a profit to * * * the trustee, * * *." Where the fairness of the transactions is at issue the burden is upon the interlocking directors to establish that fact regardless of whether the membership of the board is attributable to the control of one corporation by another, or to the stockholders, officers or directors of another and regardless of the means employed. The danger to be avoided is that the directors common to two corporations might favor one of the entities in its dealings with the other. If it be found that a fiduciary relationship existed and that it was the intention of the interlocking directors to benefit one corporation at the expense of the other, those facts alone would negative any presumption of fairness that might arise and would impose a fiduciary liability upon the corporation which had induced such action.

The liability of the defendants in this case is based upon their dealings with Pennroad's property and powers in a manner designed to benefit Pennsylvania Railroad. It exists regardless of any degree of good faith exercised because the defendants planned the domination and continued control of Pennroad which resulted in losses to Pennroad and benefit to Pennsylvania Railroad. Their breach of duty and abuse of fiduciary obligations did not involve intentional moral delinquency and certainly did not bring this case into the category of those in which controlling corporations have deliberately set out to wreck a subsidiary for their own advantage. Their acts, however, did amount to what the law considers a disregard of duty or breach of trust and a constructive fraud upon the rights of the certificate holders. "It is not damage or evil intention which creates the fiduciary relationship. It is the control, domination and active management which gives rise to it; and the trust persists through fair dealing and foul." Blaustein case, supra.

Defendants have interposed the defense of laches on the part of the complainants and contend that by analogy to the statutes of limitation, complainants should be precluded from any recovery in this action; the Overfield suit having been started on March 30, 1939, and the Weigle suit on June 7, 1940.

There is no federal or state statute expressly relating to equity suits for discovery and accounting. In Pennsylvania a general act (March 27, 1713, 1 Sur.L. 76) bars lawsuits on an ordinary debt after six years, 12 P.S.Pa. § 31. There is also the Act of March 28, 1867, P.L. 48, 12 P.S.Pa. § 41, which provides that no suit at law or in equity shall be brought or maintained against any stockholder or director of a corporation "to charge him with any claim for materials or moneys for which said corporation or association could be sued, or with any neglect of duty" except within six years after the commission of such act of negligence by such stockholder or director. That act is made expressly applicable to equity suits and, if applied by federal courts, would govern the present action so far as the directors are concerned. The

act refers specifically to neglect of duty and it would seem logical to include in that term the neglect or failure of the Pennroad directors to manage the corporation's affairs and investments for purposes other than its own benefit and profit.

 The federal courts of this district have applied the Pennsylvania statute in Kelly v. Dolan, 3 Cir., 1916, 233 F. 635, 639, which involved a stockholder's bill against living and deceased directors for neglect of duty and holding that equity jurisdiction is concurrent with that of a court of law in such cases and that " * * * a court of equity exercising concurrent jurisdiction is equally bound with a court of law to apply the statute of limitation." The statute was likewise applied in an equity action by a judgment creditor of the P. & R. Railroad Company against its former managers who were charged with having authorized improper payment of corporate funds to the president. The statute has been recognized as a meritorious defense in the interest of encouraging speedy action for the redress of wrongs committed by directors in their official capacity, and the only recognized defense is the active concealment of the wrongful acts by the parties defendant. The failure of the defendants to disclose the extent of Pennsylvania Railroad's negotiations, plans and the details of its interests in the various Pennroad ventures does not constitute such an affirmative act of concealment as would bar the running of the statute, and it seems proper to apply it to the present action against the defendant directors. It this therefore held that so far as the individual defendants are concerned the bills of complaint are barred by the statute of limitations.

 On behalf of the corporate defendant, Pennsylvania Railroad, it is argued that an inequity would be worked if the principle of the statute of limitations were not likewise applied to the claims against the railroad, whether it be recognized as an applicable statute or merely the means of determining the existence of laches. Pennsylvania Railroad contends that the acts complained of were done by the individual defendants and that to relieve them of responsibility for their acts because of the statute, and at the same time hold the Pennsylvania Railroad liable therefor would in itself constitute a gross inequity. Such conclusion does not appear to be logical in the light of the circumstances and the facts presented. It must be recognized that the

acts of the directors here complained of were the official acts of those directors performed at the direct instance, under the domination and primarily for the purposes of the corporate defendant. As individuals they joined together in authorizing the corporate action of the railroad's own instrumentality of which they were a part in serving the purposes of the railroad and not for any individual benefit to themselves. It is believed that they honestly sought to perform their functions with a full measure of loyalty to the corporation which had placed them in their positions and to its objectives as adopted and understood when Pennroad was formed. Those directors and officials did not consciously seek to injure the Pennroad but on the contrary hoped that it might also benefit from the consummation of the railroad's plans, especially if other railroads and increased freight could be brought within the Pennsylvania Railroad empire. But regardless of motives or the integrity of the directors, it is clear that they misconceived their duty toward the Pennroad investors because of the domination and influence of their actions by the Pennsylvania Railroad. Under such conditions it is not illogical to excuse the *agents* from personal liability, whether by the statute of limitations or otherwise, and at the same time hold the corporate *master* responsible for those acts which they performed on its behalf and from which it received the intended benefit.

 The statute of limitations bars the present complaints against the individual defendants but not against the corporate defendant. It is therefore unnecessary to consider the defense of laches as pleaded by the individual defendants; but since the statute of limitations does not relieve the corporate defendant, the defense of laches concerns only the Pennsylvania Railroad. In this connection it is important to consider the analogy of the statute of limitations in determining the existence or nonexistence of laches on the part of the complainants.

 "In federal courts of equity the doctrine of laches was early supplemented by the rule that when the question is of lapse of time barring relief in equity, such courts, even though not regarding themselves as bound by state statutes of limitations, will nevertheless, when consonant with equitable principles, adopt and apply as their own, the local statute of limitations applicable to the equitable causes of action

in the judicial district in which the case is heard." Russell v. Todd, 309 U.S. 280, 287, 289, 60 S.Ct. 527, 531, 84 L.Ed. 754.

The mere passage of time is no bar to a trust clearly established and where fraud or breach of trust is proved, it should not be the basis of a refusal to grant relief. The essential issues in determining the application of laches are whether the complainants' delay was unreasonable, and whether the defendants were prejudiced by such delay.

Complainant, Mrs. Ione Overfield, testified that she became acquainted with the facts suggesting wrongful conduct of the defendants as a result of the investigation made by Senator Wheeler in the United States Senate in 1938. It was during that and the year following that Senator Wheeler conducted a thorough and most searching investigation of interstate railroads and affiliates with respect to financing, reorganizations, mergers, and certain other matters. She began her suit in March, 1939, with reference to improprieties alleged to have been committed in 1929 and 1930. Senator Wheeler's investigation, although not intended to provide redress for any wrongs committed, disclosed much of the evidence upon which this suit is based, and without such information it is conceivable that the plaintiff would not have begun this suit. The Splawn and Pecora investigations, conducted by a Committee of the United States House of Representatives, in 1931 and 1932 had also made public the circumstances of the Pennroad's formation but there is no evidence that the complainants here had received from such reports knowledge or evidence which would have justified or required them to proceed thereon or be barred by laches.

It must be remembered also that Pennroad's organization and its charter and by-law provisions were designed to preclude the investors from obtaining full information as to the operation and control of the company. They were denied the right to examine the books except upon special authority. They had no organization of their own through which they could take concerted action and no meetings were provided or contemplated so long as the self perpetuating voting trustees held all of the stock, for the purpose of assuring continued control by and service to the Pennsylvania Railroad. As a matter of fact it seems that the only information available to certificate holders was that given in the annual statements, from news reports and investment manuals and possibly from reports of public investigations. The statements, news items and manuals did not make available information as to the prior negotiations and interests of Pennsylvania Railroad, the motives which prompted the formation and management of Pennroad, nor the known hazards and risks which it undertook for the benefit of the Pennsylvania Railroad. It was obviously the intention of the railroad to keep as secret as possible the details regarding Pennsylvania Railroad's interests and connections with Pennroad investments and the fact that Pennroad was an agency or instrumentality through which it sought to bring other railroad properties and business into its sphere. The disclosures made by Pennroad indicated that the stock purchases were investments in transportation companies from which Pennsylvania Railroad might also be expected to benefit, but the important details as to the motives, the benefits and the risks involved in those investments were not made public. The attitude of the corporation was most clearly indicated by President Lee who declared, "We have followed the policy so far of not ourselves making any public statements with regard to our ownerships of securities nor of any details connected therewith," and by Mr. County who said, "Let somebody else do the figuring."

The complainants as certificate holders were justified in relying upon the information received and upon the good faith and integrity of their directors and voting trustees who were charged with the duty of vigilantly safeguarding their interests. They should not be charged with laches in not demanding an examination of the books or other records concerning the details of the purchases prior to receiving the information made available by the Wheeler report. And it is doubtful whether such details would have been furnished in view of the policy of the company as expressed, and certainly it could not be expected that evidence would have been made available for the purpose of starting this or a similar action. The secrets of Pennroad until the congressional investigation were as inviolate as the secrets of the Tomb of King Tut.

The fact that the Perrine suit has been pending in the Court of Chancery in the State of Delaware since 1932 is set up as a further indication of the failure on the part

of the complainants to bring suit before the present actions were instituted. That was also a certificate holder's suit involving the same causes of action in general terms, and it sought an accounting on behalf of Pennroad and its certificate holders including the present complainants. The case was not brought to trial by 1939 when the present action was started, the Judicial Code, § 51, 28 U.S.C.A. § 112, having in the meantime (April 21, 1936) been amended, and enabling all of the parties to be brought into this forum. The Perrine suit was brought for the benefit of the Pennroad Corporation and its certificate holders and not merely for the benefit of the plaintiff named therein. It is to be expected that when such suit is brought other parties in the same position will rely upon such action to protect their interests without devoting their time and money in a separate effort for like purposes, and from which they would receive no greater benefit.

■ The courts have recognized the propriety of such attitude by refusing to charge stockholders with laches for their failure to act until the outcome of the pending suit has been determined. "The essence of laches is not merely lapse of time. It is essential that there be also acquiescence in the alleged wrong or lack of diligence in seeking a remedy. Here plaintiffs, or others representing them, protested * * * and ever since they have * * * persisted in the diligent pursuit of a remedy * * *. Where the cause of action is of such a nature that a suit to enforce it would be brought on behalf, not only of the plaintiff, but of all persons similarly situated, it is not essential that each such person should intervene in the suit brought in order that he be deemed thereafter free from the laches which bars those who sleep on their rights." Southern Pacific v. Bogert, supra, [250 U.S. 483, 39 S.Ct. 536, 63 L.Ed. 1099].

■ The complainants have not delayed the institution of this action an unreasonable time after discovering the facts and evidence upon which this suit is based. It remains to be determined whether Pennsylvania Railroad has been prejudiced by the delay to the extent that the principle of laches should be applied. The mere passing of time does not necessarily result in prejudice of a defendant's rights or position. The difference in the circumstances of the corporate defendant at the time of the cause of action and the present time is only in the fact that several of the directors have since died and their testimony is not available to further explain their actions as such directors. It must be recognized, however, that such directors were merely members of the group which as a corporate organization did the things complained of and that the corporation and individuals most directly responsible for the plan and creation of the Pennroad instrumentality are presently alive and gave a full and complete history of all facts and circumstances involved in the present issue. General Atterbury is the only really active participant in the formation of Pennroad who is deceased. It is difficult to conceive how any more complete or detailed facts could be offered by the defendants nor how those facts could be presented more frankly.

The acts complained of were done in the interest and in the furtherance of the plans and purposes of the Pennsylvania Railroad, and by means of its control and domination of the directors, who were by reason thereof constituted the instrumentality through which Pennsylvania Railroad acted. They had no individual interest separate and apart from that of the company and the absence of those deceased has not prevented a full disclosure of all of the facts and circumstances which prompted their actions from the records of the companies and the testimony of those persons most directly responsible. The railroad formed, and has continuously enjoyed the benefit of, Pennroad and mere delay has not prejudiced its right or ability to justify its acts. Furthermore the Pennsylvania Railroad has had knowledge since 1931 of the charges brought against it and of its continuing duty to justify its acts because of the New York stockholder's suit, the Splawn, Pecora and Wheeler investigations and the Perrine suit started in 1932. Throughout all of these actions it has taken the position that it is not responsible to Pennroad or Pennroad investors, that it had no control over Pennroad, that the purchases made were bona fide investments made in the interests of the investors and that Pennroad was not an adjunct or instrumentality designed and intended to primarily serve Pennsylvania Railroad in acquiring railroad stocks or properties. Pennsylvania Railroad has been prepared to defend these charges and to justify its relationship to the matters in question throughout all these years, and now that the opportunity is presented and all of the facts and the testimony of the principal

actors made available, it does not appear that any prejudice to the defendants' rights exist merely by reason of delay nor because of the death of the directors whose acts on behalf of the defendant are questioned. "The defendant necessarily was acquainted with the character of the litigation, with the questions involved * * * and in the face of these facts, with full notice of the nature of the claim, has no ground for insisting that it would have acted otherwise if the plaintiffs had sued at an early day. It was not required that each particular stockholder should sue for his share * * * to preclude the defendant from claiming an acquiescence and estoppel * * * the plaintiffs and other stockholders were entirely justified in awaiting the result of suits pending without incurring the hazard of losing their rights on account of the lateness of their demand." Boardman v. Lake Shore & Mich. Southern Ry., 84 N.Y. 157, 187.

■ If there has been an unreasonable delay or if the delay has seriously handicapped the defendant's ability to produce important testimony that would otherwise have been available, such laches will be fatal to the plaintiff's case. "The rule is peculiarly applicable where the difficulty of doing entire justice arises through the death of the principal participants in the transactions complained of." Hammond v. Hopkins, 143 U.S. 224, 12 S.Ct. 418, 427, 36 L.Ed. 134, or "* * * where the delay has led to a change of conditions that would render it unjust to disturb them * * *." Hays v. Port of Seattle, 251 U.S. 233, 239, 40 S.Ct. 125, 127, 64 L.Ed. 243. An important part of the laches rule is the period fixed by the statute of limitations and while such statutes are not operative in equitable proceedings, the analogy of the statute is frequently applied. "The statute of limitations is a legislative declaration by the state of the common judgment as to the period within which a suit may be brought without placing the defendant at an unfair disadvantage by reason of lapse of time. As such, it provides a definite guide for courts in determining the same question in other than common-law causes. Ordinarily it requires a strong showing of unfairness to the plaintiff to induce the courts to depart from it." Stampalia v. Murphy, D.C., 34 F.2d 660, 661. Under the circumstances of this case there appears to be no difficulty in doing entire justice because of the death of the principal participants, or by any other change of conditions rendering the position of the defendant appreciably more difficult. The application of the principle of laches or the analogy of the statute of limitations to these complaints would constitute such a strong showing of unfairness to the complainants that the court may properly decline to be bound by the principles of laches and may hold that complainants have not been precluded from seeking relief because of laches.

Having determined that the individual directors are excused from liability by reason of the statute of limitations and that the corporate defendant may not have the benefit of the defense of laches, it becomes important to find the degree of its liability. The facts have shown that the actions of the officers and directors were prompted by the Pennsylvania Railroad and accomplished through its actual, although not technical, control of the Pennroad Corporation, and primarily in the interest of the Pennsylvania Railroad; and further that such acts resulted in loss to Pennroad and a benefit to Pennsylvania Railroad free of the risk involved in the investments. The individual defendants stood in no position to gain any personal advantage but were the loyal and willing servants of the railroad in the promotion of its empire. To hold the individual defendants liable for the benefits enjoyed by the railroad, even though they joined in and actively contributed to the breach of fiduciary duty imposed on all, would impose upon them an inequitable burden. In justice it would seem more proper to charge the full measure of liability to the defendant who was the prime mover and whose designs and purposes were to be served and who, by actual domination and control of the corporate agency and its component parts, received and was intended to receive the benefits therefrom.

■ It has been found that the Pennsylvania Railroad and the individual defendants occupied a fiduciary relationship to Pennroad and its certificate holders, and that their conduct of Pennroad's affairs and investment policies in the interest of Pennsylvania Railroad constituted a breach of their fiduciary duties. All of the fiduciaries have properly been made parties defendant and, upon proof of the

breach, each may, except for the statute of limitations, be found liable jointly and severally to the beneficiaries, regardless of any rights of contribution among themselves. Rights to contribution or indemnity as between such fiduciaries might be determined by the same equity court in separate proceedings brought for that purpose. Where, however, all of the fiduciaries are in court and their joint and several liabilities have been established, the court may, in the interest of avoiding a multiplicity of suits, adjust the recovery of the beneficiaries according to the burden each defendant will ultimately be called upon to bear. Rights of contribution or indemnity depend upon the circumstances and relationship existing between the fiduciaries and the degree of their respective faults, and in dealing with such parties equity will not rigidly apply the joint and several liability of joint tort-feasors. In the matter of determining the degree of fault and the burden of liability in connection with contribution and indemnity as between trustees, the Restatement of the Law, Trusts, Sec. 258, indicates certain factors which should be considered. Whether the trustee (1) was fraudulently induced to join in the breach, (2) intentionally committed it, (3) because of his greater experience he controlled other trustees who relied upon his judgment or (4) whether one trustee alone committed the breach, and the liability of the others is imposed only because of an improper delegation, or failure to exercise reasonable care to prevent such trustee from violating the trust. Few reported cases have been found in which these principles were applied, although the texts substantially support the power of an equity court to adjust the respective liability of several co-fiduciaries among themselves, or to make one primarily and the other secondarily liable, or to determine the burden which each of them should bear in order to discharge their liability to the beneficiaries arising out of a breach of their trust. Perry, Trusts and Trustees, 7th Ed., Sec. 876, 848; Lewin, Trusts, 14th Ed., 777, 778; Scott, Trusts 258–1, 258–3; 3 Bogert, Trusts and Trustees, §§ 590, 701. In dealing with the right of indemnity by one fiduciary against another, it has been said that "Such an obligation arises in equity from the relation of the parties where two trustees are liable for a breach of trust and one has applied the trust fund to his own use; in that case the trustee who has so misapplied the fund is liable to indemnify his co-trustee. * * *" Wynne v. Tempest, 1897, 1 Ch. 110. And in determining the question of whether a discrimination should be made between two fiduciaries it was stated in McCartin v. Traphagen, 43 N.J.Eq. 323, 334, 11 A. 156, 162, "Difference in the degree of liability, owing to difference in the extent of the culpability, has been recognized by the courts * * *. Mr. Lewin states the rule now in force on the subject, as follows: 'Though, as respects the remedy of the cestui que trust, each trustee is individually responsible for the whole amount of the loss, whether he was principal in the breach of trust, or was merely a consenting party, yet, as between the trustees themselves, the loss may be thrown upon the party on whom, as the recipient of the money or otherwise, the responsibility ought in equity to fall, or, if he be dead, upon his estate.' Lewin, Trusts 776."

If therefore a court of equity may effect contribution or indemnity as between defaulting co-fiduciaries in a separate proceeding for such purpose; or in the original proceeding brought by the beneficiary against the fiduciaries, in the interest of avoiding a multiplicity of suits; and if in such proceedings the chancellor may impose liability in accordance with the degree of culpability of the respective co-fiduciaries; it must then follow that the liability in this case can be fixed in like manner and to the extent that the whole responsibility may be charged to the dominant fiduciary which caused the breach and received the sole benefits from the actions which constitute the breach. Such conclusion could have been reached whether or not the statute of limitations was applied to the individual defendants and regardless of the death of some of them; and it is consonant with the facts and circumstances found herein.

The measure of liability and the character of the remedy to be applied imposes an extremely difficult problem. On behalf of the plaintiffs it is urged that since the defendants have violated their fiduciary obligations, they are jointly and severally liable for the full amount of the losses sustained by Pennroad, with interest, plus an accounting and recovery of all of the profits received by Pennsylvania Railroad and resulting from the operations and pur-

chases of Pennroad. On the other hand defendants contend that even if liability were imposed the complainants are precluded from claiming any recovery or accounting because they assented to and joined in the perpetration of any wrongs done. And on behalf of Pennsylvania Railroad, it is urged that its liability if any must be deemed a secondary one inasmuch as the individual defendants were the primary actors in the formation and operation of Pennroad. None of these positions seems sound or consonant with the equities of this case.

■ Generally speaking, a fiduciary is under a duty to administer the trust solely in the interest of the beneficiary, and upon failure to do so, he is chargeable with any loss or depreciation resulting therefrom, and even though a similar loss might have occurred due to economic conditions in the absence of such breach. In applying this principle "Courts of equity have felt that it is only by imposing a strict rule like this that all temptation to the trustee to act in his own interest rather than in that of the beneficiaries can be removed. The same rule is applied to other fiduciaries." Scott on Trusts, 681. The author declares that such trustee is ordinarily liable for interest thereon, although this is within the discretion of the court; and in exercising such discretion, consideration will be given to the character of the breach and the degree of the trustee's fault. Pp. 1107-1109. The redress allowed may be in the form of reimbursement by the fiduciary for the difference between the purchase price of the property and the fair value thereof at the time of suit; or it may be reimbursement by the fiduciary to the estate for the full purchase price with interest. Neither of these remedies will do full justice to the parties, and on the contrary their application would result in an inequity rather than in a fair adjustment of liability of the defendants.

■ Although certain equitable remedies are adopted with sufficient frequency to create rules applicable in many cases, their application should be affected or circumscribed by the nature of the case; and while a court of equity, in exercising its remedial power, proceeds with a discretion controlled by legal principles, as distinguished from an arbitrary exercise of power, its power to grant relief is not circumscribed by any fast or technical rule. A court of equity has a broad discretion in granting its remedies in order to adapt the relief to the circumstances of particular cases. Hopkins v. Grimshaw, 165 U.S. 342, 358, 17 S.Ct. 401, 41 L.Ed. 739; Jones v. Missouri Edison Elec. Co., 8 Cir., 144 F. 765. There are many cases in which the mere application of recognized principles without qualifications will not do entire justice to either party. Some modification of their rights and duties may be required which the law courts may not prescribe, but equity courts are not so restrained. Their remedies are flexible and may be suited to the justice and exigencies of the particular case. "A court of equity does not feel itself bound to a rigid application of a rule * * * in order to give proper relief * * *." Sabre v. United Tract., Etc., Co., C.C., 156 F. 79, 83. It will adjust and conform the relief in such manner as to afford a fair recognition of the rights of all parties, the primary object being to reach the ends of justice. Union Mill, Etc., v. Dangberg, C.C., 81 F. 73. Power is conferred upon equity courts to determine all of the rights of the parties and to grant such relief as will finally determine the issues between them and the decree should be framed to that end. Wabash, Etc., Canal Co. v. Beers, 2 Black 448, 17 L.Ed. 327; Central Imp. Co. v. Cambria Steel Co., 8 Cir., 210 F. 696. "The court of equity in all cases delights to do complete justice, and not by halves" (Hefner v. Northwestern Mut. Life Ins. Co., 123 U.S. 747, 756, 8 S.Ct. 337, 341, 31 L.Ed. 309, quoting Marshall, C. J.), and where the plaintiff has clearly established his right, the court will grant appropriate relief regardless of the inconvenience of the defendants. Woodruff v. North Bloomfield Gravel, Etc., Co., C.C., 18 F. 753.

■ If there are several defendants whose joint liability on a claim inseparably common to them all is established, relief will ordinarily not be granted against one and denied as to the others (Mandeville v. Riggs, 2 Pet. 482, 7 L.Ed. 493) and certainly not where the cause is still pending as to the others. Frow v. De La Vega, 15 Wall. 522, 21 L.Ed. 60. Where, however, the liability is several the relief should be against each severally, according to his liability, or if the liability of one can be adjudicated without affecting the rights of

others a decree may be entered against the one so found to be liable. Equity courts have the power to determine the ultimate rights and obligations of parties on the same side where this is necessary to a complete determination of the controversy, and where the order of the respective liabilities is ascertained. The liability will be imposed immediately upon him who is ultimately liable, thus avoiding circuity of proceedings. Garnett v. Macon, 10 Fed. Cas. No. 5,245, p. 12.

■ Adverse or conflicting interests between co-defendants may be passed upon and relief granted based upon proofs of the subject matter in litigation between plaintiffs and one or more of the defendants. Louis v. Trustees of Brown Tp., 109 U.S. 162, 3 S.Ct. 92, 27 L.Ed. 892; Corcoran v. Chesapeake, Etc., Canal Co., 94 U.S. 741, 24 L.Ed. 190. The rule is well settled that where a case is made out between defendants a court of equity is entitled to make a decree as between them and should do so in the interest of precluding the defendant chargeable from becoming a defendant in another suit involving the same charge or for the determining of the liability between the defendants. Roots v. Mason City Salt, Etc., Co., 27 W.Va. 483, 489.

If the plaintiffs' measure of damages were adopted, there might be awarded to Pennroad the full amount of Pennroad's investments in the securities and properties complained of, with interest, plus such profits and financial benefits to Pennsylvania Railroad as could be attributed thereto, and determined by an accounting to be rendered. In that case Pennsylvania Railroad would be entitled to take over those securities and properties whereupon it would be faced with the problem of disposing of those it could not properly retain. As an alternative, there might be awarded to Pennroad the difference between the purchase prices paid and the fair value of the stocks and properties, and also the profits derived from them by Pennsylvania Railroad and as established by an accounting. These measures conform to the rules recognized in certain cases of breach of trust by fiduciaries, and should be applied where equity and justice so demand. Equity, however, is not circumscribed by fast or technical rules and may grant redress suitable to the require-

ments of justice of the particular case, and without being bound by a rigid application as to the rules of damage.

■ The granting of an award upon either of the suggested bases would deny certain important elements their proper effect in determining the equities, and would ignore certain distinctions and comparisons between the various transactions in question. While it is apparent that all of the purchases were made in breach of the fiduciary obligations of the defendants, and that they were intended primarily to secure advantages to the Pennsylvania Railroad, it is also clear that there is a difference in the character and degree of the intended benefit and in the knowledge and participation of the investors in the various purchases. There can be no question that the purchase of D. T. & I. stock constituted an investment of Pennroad's funds, or that it was made as a result of the Pennsylvania Railroad negotiations prompted by the railroad's desire to acquire D. T. & I. traffic and to prevent it from being taken over by a competitor. The same may be said for the Pittsburgh & West Virginia and the Canton Company purchases. It is likewise true that the purchase of Seaboard Airline, Lehigh Valley, New York, New Haven & Hartford, and Boston & Maine stocks were actual investments in going concerns in which there then existed some prospects of profit based upon past experience, the general regard in which railroad securities were held, or upon the hope and expectation that those roads would become more profitable and valuable by cooperative operation with Pennsylvania Railroad. They were all made with the view to bringing a closer ownership or operating alliance with Pennsylvania Railroad by means of the friendly stock ownership of the Pennroad. This was in line with the announced purpose of Pennroad to cooperate with Pennsylvania Railroad in acquiring interests in transportation which the railroad was prohibited from doing and to which the certificate holders were committed by their subscriptions. The purpose was so generally known and conceded that those holders who acquired certificates subsequent to the original subscriptions knew or should have known it and the method of its accomplishment. To that extent it may be said that the certificate holders are in no position to

618

complain that their voting trustees, directors and management invested in properties which were or could be useful or beneficial to the railroad. Nor may they be heard to complain about the means or organization adopted for bringing those properties into the fold, and continuing their control in the interest of serving the railroad. By their subscriptions or subsequent acquisition of certificates, they assented to the design of the voting trust and the interlocking directorates and management.

At the same time the certificate holders were undoubtedly entitled to a fair administration of the company's affairs by their trustees, officers and directors, regardless of how chosen, and to a full disclosure of the facts, circumstances and motives that prompted any actions in which there was even a possibility of conflicting interests as between their company and the Pennsylvania Railroad. If a benefit was to be derived either in the form of a profit to Pennroad, or an advantage to Pennsylvania Railroad which would indirectly benefit them and not conflict with their interests, they could not complain; and so long as their managers honestly sought to serve the welfare of Pennroad and its certificate holders, and only incidentally the Pennsylvania Railroad, they performed their intended function. Where, however, there was a failure to disclose facts or circumstances upon which an inference or possibility of conflict could be based, or where the risk or hazard was unequally placed as between Pennroad and Pennsylvania Railroad, it may be said that those in control violated their trust, and the beneficiaries are not precluded from holding them responsible. The certificate holders were entitled to the benefit of the faithful and honest judgment of those in charge, and nothing in the Pennroad set-up would in itself indicate that they would not get such representation, even though it be admitted that the Pennsylvania Railroad's influence was predominant in the plans and purposes of their company.

The evidence shows quite clearly that the defendants sought primarily to serve Pennsylvania Railroad in the D. T. & I., P. & W. Va. and Seaboard stock purchases and that such purchases involved a conflict of interests in that they contemplated substantial and almost assured benefits to Pennsylvania Railroad while the sole risk was placed upon Pennroad. The same may be said in a lesser degree of the Canton Company, New York, New Haven & Hartford and the Boston & Maine purchases, all of which constituted investments intended to improve Pennsylvania Railroad's traffic and competitive or consolidation position and with the further purpose of benefiting Pennroad through profits expected to result from the cooperation of those roads with Pennsylvania Railroad. The essential element of the complaint with regard to those investments is that Pennroad was induced to pay excessive prices therefor and it is now entitled to reimbursement for the difference between the fair prices and those paid. There is no complaint that such purchases were not within the scope of investments intended and assented to, or that there was no possibility of any advantage inuring to Pennroad. It appears, however, that such possibility of profit as may have then existed was remote in comparison, that the directors were more concerned with the prospects of benefiting the railroad, and in so exercising their judgment in favor of Pennsylvania Railroad they breached their fiduciary duty to the certificate holders. It must be recognized that although the certificate holders did not anticipate such breach, they had assented to the set-up which made possible a conflict of interest; and consideration must be given to the strength or weakness of their equitable right to presently complain, and to the honesty with which the directors acted in the accomplishment of what they understood was their function and primary objective.

With regard to those purchases, the breach of fiduciary duty was a technical one such as might or should have been foreseen from the first, and which was actually foretold in Mr. Roberts' letters. The directors and managers, with the assent of all parties, had been placed in a position where a conflict was almost certain to develop and where they would be compelled to differentiate and to serve the interest which predominated. It is believed that they acted honestly and conscientiously and that there was no element of fraudulent intent or bad faith on the part of any of the persons involved, and that their default resulted from a misconception of their fiduciary position and primary duties. It would seem unconscionable under these circumstances to charge the defendants with the *full liability* which might be imposed upon

deliberately unfaithful trustees, especially in view of the knowledge of their difficult position by all of the parties concerned.

The losses resulting from the purchases of railroad stocks and securities are not so directly attributable to the defendants' breach of trust as to make it just to hold them fully accountable in the maximum amount. Consideration must fairly be given to the general conditions then existing, the trends and hopefulness of the times, and to the seriousness and extent of the subsequent depression and its effect upon declining values. The equities of this case do not demand the imposition of the full possible liability upon the defendants; yet the circumstances render it almost impossible at this time to measure a lesser degree of responsibility because all of the evidence regarding values and losses is based upon opinions of experts or the calculations of those interested on one side or the other.

Evidence was presented showing that the purchases of railroad stocks were made at excessive prices or at least prices in excess of those which the Pennsylvania Railroad would have been willing to pay out of its own funds; and the direct inference is that the railroad was less conservative in causing Pennroad to spend its capital than the railroad would have been in the investment of its own funds. On the other hand the valuations fixed by the railroad for its purposes may not have represented the actual commercial value to Pennroad, or, it may be found that the purchase prices paid more nearly represented acceptable investment values in the light of the conditions, optimism, or the prevailing judgment of investments as of that period. It may also be recognized that by reason of the circumstances of the Pennroad and its relationship with Pennsylvania Railroad, some consideration may properly be given to the possibility of special advantages to Pennroad arising out of its part in extending the railroad empire and traffic with the attendant prospect of increasing, through cooperative management, the earnings and value of the roads whose stock was purchased.

The principal issues presented concern the liability and accountability of the defendants to Pennroad and the determination of relationships and their legal and equitable effect; and having concluded that the corporate defendant is accountable, although not equitably chargeable with the maximum losses or differences between the valuation of the investments as given by experts chosen by the respective parties and the prices paid, the secondary problem of fixing the degree and extent of the redress to be granted must be approached only after the fullest possible disclosure of all matters having to do with the conditions of the period, values and the prospects of the respective parties in the success or failure of the plans which prompted the purchases. The evidence as to values, market prices and losses concerning the stock purchases is not deemed to be sufficiently complete or impartial to justify a fair and equitable measurement of the financial obligation to be imposed, nor do the amounts and calculations sufficiently take into account the influence of then existing conditions or the subsequent depression upon the honest opinions of the persons concerned. It therefore seems essential that further inquiry be made, preferably impartial, as to the amount which Pennroad might, in view of the interests, relationships and prospects of the parties, have justifiably paid for the stocks purchased. Such inquiry might be made in supplementary hearings or by reference or examination as shall be determined after further consideration by the court and a hearing of the parties, and with the view solely to advising the chancellor as to the fairest possible measure of the defendants' financial liability.

Passing from the purchases of railroad stocks, the breach of fiduciary duty and the measure of resultant damage, and turning to the National Freight matter, it will be noted that other elements are found in that enterprise which makes possible a present adjustment of the equities between the parties and a basis of the redress to be granted. The D. T. & I. and other railroad purchases were undoubtedly "investments made on a much broader basis than was then possible under the limited powers of a railroad company, within the field of transportation, and for the material advantage of Pennsylvania Railroad" as originally announced to the prospective investors. The National Freight venture, however, does not appear to be an investment in the same sense, nor can it be properly considered as the "taking advantage of opportunities not possible to the railroad company" as declared in the same announcement. As previously pointed out, National Freight was in fact the railroad's instrumentality which Pennroad formed at

the instance of the railroad to meet the freight problem then confronting it. The company was formed and operated as a Pennsylvania Railroad subsidiary in pursuance of the railroad's own intention and necessity for entering into competition with the New York Central and its subsidiary, Universal Freight, and other forwarding companies operated by railroads. It was created at a time when the forwarding business was young and expanding rapidly, and it was thought to have a promising future. The success of such venture, however, was not assured by general experience, and even the railroad's experts indicated the serious burdens and hazards of competition before National Freight was started. It was also shown that the possible benefits to the railroad far outweighed those of Pennroad in that the railroad would receive all of the traffic which the forwarding company could control and the profit therefrom and also rental of its facilities, whereas Pennroad as the sole stockholder could only hope for dividends earned from a business dependent entirely upon the difference between shipping at carload and less than carload rates. At the same time it was intended that Pennroad would risk all of the required capital, assume the burden of the promotion and the development of a new business. Even in the light of conditions then existing, the enterprise was undoubtedly speculative and its capital was risked far beyond the degree of risk involved in any reasonably "sound investment". These facts were known or should have been known to those in charge, and their optimism as now described does not satisfactorily justify the expenditures on the venture nor deny the conclusion that National Freight was in fact, if not technically, an agency or subsidiary of Pennsylvania Railroad formed solely for the purpose of enabling the Pennsylvania Railroad to engage in the forwarding business in competition with other railroads operating through direct subsidiaries.

The distinction between the "investments" in railroad stocks and the promotion and operation of National Freight is so marked, and the freight venture is so far removed from the purposes as originally announced, that it seems proper to differentiate between the liability resulting from the investments and that attributable to the National Freight.

In this matter the directors and managers far exceeded the authority given to them directly or by inference to make investments which would incidentally benefit the railroad, and deliberately formed an instrumentality to effectively put the railroad into the forwarding business. They adopted the arrangements and plan of the railroad for that purpose and depended upon it to furnish experts and managers to carry out the plan. Here again it may be conceded that the directors acted conscientiously and without deliberate fraud or any intent to benefit themselves. It is obvious that they honestly believed their duty was primarily to accomplish the extension of the railroad empire and its field of business, while at the same time intending no harm to Pennroad. On the contrary they were hopeful that Pennroad would also profit from the venture in spite of the burden and risk imposed upon it. The actions of the directors and managers, and of the Pennsylvania Railroad in exercising its practical control and domination of them, in the freight enterprise constituted the most flagrant breach of the fiduciary obligation imposed upon them by the circumstances of this case. It is equally clear that the sole beneficiary of the National Freight venture was the Pennsylvania Railroad and that it did profit substantially from freight revenues, rentals and the promotion of its competitive position as long as the freight company was operated. The liability should therefore in good conscience be imposed upon that member of the group who directed or controlled it and who profited by the action taken.

The defendant Pennsylvania Railroad is therefore chargeable with the whole amount of the capital contributed to the National Freight venture on its behalf and is required to reimburse Pennroad for such sum. Credit, however, shall be given for the net amount received by Pennroad in the final disposition of its holdings in the freight company. The Pennsylvania Railroad is also accountable to Pennroad for any and all net profit it received from the operation of National Freight on its behalf by Pennroad. The breach of fiduciary duty in this transaction is such that the railroad is not entitled to any benefit whatever as against Pennroad and its certificate holders and a full accounting of the more than five million dollars gross income should be rendered so that the net profits may inure to the lawful beneficiaries of the business. The claim to interest on the net capital expenditure is denied inasmuch as the profit

or earnings from the employment of that capital is included in the present award of the net profit received by Pennsylvania Railroad, and to be fixed by an accounting.

The reimbursement and accounting to be made will be substantial in amount and in the opinion of the chancellor represents a fair measure of the total damages arising out of the National Freight Company venture and for which the corporate defendant may be equitably charged.

The facts essential to a determination of the issues as recited in the foregoing discussion and more fully disclosed in the voluminous record are summarized in the following specific findings of fact:

1. Pennsylvania Railroad in and prior to 1929 desired to extend its sphere of operations and railroad affiliations and to increase its business, and had been considering the advisability, necessity and possible methods of acquiring stock of other railroads with the view to protecting and extending its business and to improving its position in the matter of proposed consolidation of railroad systems.

2. Because of I. C. C. regulations and the Transportation Act, it was not legally possible for the railroad to acquire such stock without reporting the same and securing the approval of the I. C. C. and it was deemed doubtful as to whether such approval could be obtained. The same obstacles would be presented if the Pennsylvania Railroad acquired such stockholdings through Pennsylvania Company, its wholly-owned subsidiary.

3. The officials and directors of Pennsylvania Railroad, acting within the scope of their official duties and service to the railroad and on its behalf, consulted with counsel and with Kuhn Loeb & Company, bankers with whom Pennsylvania Railroad had dealt for years prior thereto, with the view to devising means of acquiring the benefit of such stockholdings without said restrictions. As a result of said consultations, the Pennsylvania Railroad officials decided upon a plan of organizing a corporation which would have power and be permitted to own stocks of other railroads which the Pennsylvania Railroad could not then own or acquire without the approval of the I. C. C., which corporation would procure the capital for such purposes, and at the same time constitute a separate legal entity not owned by Pennsylvania Railroad nor restricted by existing I. C. C. regulations.

4. The plan devised by the Pennsylvania Railroad officials contemplated that Pennsylvania Railroad management should have and retain practical control of the new corporation and its operations, although such corporation would have the appearance of an independent entity, and the power to bring other railroad properties within the sphere of the Pennsylvania Railroad system without the necessity of reporting or obtaining approval of such acquisitions.

5. The means adopted for acquiring and retaining the control of the new company consisted of a voting trust in which all of the stock of the new company would be placed for a period of ten years, the voting trustees were to be the president and two important directors of Pennsylvania Railroad, and the election of directors was to be provided for in such manner that one-third would be elected each year for a term of three years; H. H. Lee, treasurer of Pennsylvania Railroad to be chosen as the president of the new corporation and such president and seven members of the Pennsylvania Railroad finance committee were to constitute the board of directors. Pennsylvania Railroad had intended to have no financial investment in the new corporation.

6. Pennsylvania Railroad took no formal corporate action in connection with the formation and organization of the new corporation although the plans and devices adopted were formulated by the executive and financial officers of the Pennsylvania Railroad in the course of their official service to that company. Said plans were carried out and the said actions were taken with the view to preserving the Pennsylvania Railroad business and improving its competitive position and its situation with regard to the proposed consolidation of railroads.

7. Pennsylvania Railroad directors on the day that the new corporation was formed approved of the plan and by corporate action authorized the announcement of Pennroad's formation, organization, official personnel and its purpose to the Pennsylvania Railroad stockholders, and invited them to invest in Pennroad voting trust certificates.

8. The new corporation was named Pennroad with the view to identifying it with the Pennsylvania Railroad. The

charter was obtained and filed under the laws of Delaware and the formal organization of the corporation was completed on April 24, 1929. The charter gave the corporation power to engage in any kind of business except banking or the operation of public utilities.

9. The charter and by-laws of the corporation provide that no stockholder shall have any right to inspect any account, book or document except as conferred by the laws of Delaware or unless authorized to do so by resolution of the board or of the stockholders, and that the corporation shall not be required to make public in any manner to its stockholders or otherwise any statement concerning its assets, liabilities or earnings unless so authorized. It was provided further that a stock ledger be maintained at the office of the corporation in Delaware, that any officer may be removed by a vote of a majority of the board of directors at a special meeting or by a committee or officer upon whom the power of removal may be conferred by the board, and that an executive committee be created with the president as an ex-officio.

10. The purpose of the provisions in the charter limiting the rights of the stockholders was to give the directors of Pennroad control of the corporation at all times and without an interference of persons investing in its stock.

11. Henry H. Lee resigned as treasurer of Pennsylvania Railroad and became president of Pennroad and one of its eight directors. The other directors were members of the board of directors of Pennsylvania Railroad and members of its finance committee. The vice president and general counsel of Pennsylvania Railroad acted as counsel of Pennroad without compensation until September 14, 1932, when he was officially made counsel for Pennroad at an annual salary to take effect on October 1, 1932, at which time he retired as general counsel for Pennsylvania Railroad. He continued, however, to be retained as special counsel for Pennsylvania Railroad at a stipulated salary.

12. In the promotion and organization of Pennroad and the sale of its voting trust certificates, Pennsylvania Railroad furnished the services and facilities of its employees and offices at an expense of $106,000 which sum was subsequently repaid to Pennsylvania Railroad by Pennroad.

13. All of the original officers and employees of Pennroad were at the time Pennroad was formed, employees of Pennsylvania Railroad.

14. On April 24, 1929, the date of Pennroad's incorporation, the Wilmington Trust Company advanced $21,050 toward the expenses of the organization of Pennroad which advance was made at the direction of Pennsylvania Railroad officials and upon its credit. In the course of the organization of Pennroad and in pursuance of the plan, Pennsylvania Railroad caused a voting trust dated May 1, 1929, to be created, and caused W. W. Atterbury, its president and director, E. B. Morris, director and chairman of its finance committee, and Jay Cooke, a director, to be named as voting trustees of Pennroad for a period of ten years with the power in said trustees to fill any vacancy that might occur during said period.

15. Pennsylvania Railroad had in and prior to May, 1929, potential control of Pennroad, its management, finances and the exercise of its corporate powers. This potential control included the voting rights in respect to all stock of Pennroad through the selection, loyalty and domination of the voting trustees and the power to perpetuate such voting trustees for a period of ten years. It had practical control of the actions of the board of directors through and by means of the election to said board of a complete slate of Pennsylvania Railroad officers and directors including the president, vice president and the former treasurer of Pennsylvania Railroad. It had practical control over all of the principal executive and administrative officers of Pennroad through the selection of its former treasurer and assistant treasurer as president and vice president respectively and by the appointment of former Pennsylvania officials or employees as the principal executive and administrative officers, all of whom were known by reason of their long connection with Pennsylvania Railroad to be loyal to Pennsylvania Railroad and its purposes and ambitions, some of whom had devised the plan to serve its purposes. These controls existed at the time of the organization of Pennroad and were designed to be continued at least throughout the period of the voting trust.

16. The Pennsylvania board of directors on April 24, 1929, authorized the offer of voting trust certificates of Pennroad to

Pennsylvania Railroad stockholders at $15 per share, and at the same time letters of the Pennroad and of Pennsylvania Railroad were sent to said stockholders describing the purpose and objective of the new corporation, its officers, directors and voting trustees.

17. The president of Pennroad requested the directors of Pennsylvania Railroad to furnish him with the names of persons not Pennsylvania Railroad stockholders to whom an offer to subscribe might be extended. Names of shippers, prospective shippers and friends of Pennsylvania Railroad were furnished by the Pennsylvania Railroad directors and some of them subscribed for certificates at $15 when the stock was selling on the market at a price in excess of the subscription price.

18. On April 29, 1929, Pennroad authorized its officers to borrow from banks without collateral the sum of $20,000,000 at the rate of 5%. The banks involved were depositories of Pennsylvania Railroad or banks of which some of the directors of Pennsylvania Railroad were directors. The purpose of said loan was to put Pennroad in a position to make a down payment on account of the purchase of the Detroit, Toledo & Ironton, negotiations for which had been substantially completed by Pennsylvania Railroad on March 22, 1929.

19. In and prior to April, 1929, Pennsylvania Railroad had been endeavoring to put itself in a favorable position with respect to the consolidation of railroad systems, and in order to accomplish this purpose it was deemed necessary to acquire substantial interests in certain railroads which Pennsylvania Railroad desired to have directly or indirectly within its own system. Prior to that time Pennsylvania Railroad had used its wholly-owned subsidiary, Pennsylvania Company, for such purpose. The Interstate Commerce Commission had questioned the right of Pennsylvania Railroad to acquire through Pennsylvania Company stock which it could not acquire except with the consent of I. C. C. Pennroad was designed and intended to overcome this limitation and objection.

20. On September 5, 1929, General Atterbury, president and director of Pennsylvania Railroad and a director of Pennroad, caused a special meeting of Pennroad to be held for the purpose of having the board authorize the purchase of 220,000 shares of stock of the Pittsburgh & West Virginia Railroad at which meeting he reported having reached an agreement with the principal holder of P. & W. Va. stock to purchase not less than 218,000 shares at $170 per share. In order to pay for the said stock it was deemed necessary to sell additional voting trust certificates of Pennroad. Thereafter and on September 25, Pennroad's board authorized the issuance of 325,000 shares at $16.50 per share, and the voting trust certificate holders were given the privilege of subscribing for the same on or before November 19, 1929. The president was authorized to agree with Kuhn Loeb & Company to underwrite the subscription for said shares for a compensation not exceeding $1.50 per share and an additional commission of 50c per share on each of said shares not subscribed for. The board authorized the execution and delivery of transfer option warrants to Kuhn Loeb & Company entitling them to purchase voting trust certificates for an additional 125,000 shares. As a result of the offer, 1,596,828 shares were subscribed for by the voting trust certificate holders and the bankers took 1,428,172 shares. Commissions allowed to the bankers were $5,251,586 and the net amount received by Pennroad was $44,660,914. Accompanying the offer were letters from Pennroad advising that the funds derived from previous subscriptions had been advantageously employed and that further desirable investments are now being made and others will be available, for which the corporation required the additional funds.

21. On April 24, 1929, the incorporators of Pennroad were agents and representatives of Pennsylvania Railroad acting in its behalf, and at that time subscribed for sixty-seven shares of Pennroad stock which were the only shares initially subscribed. Pennroad was organized primarily for the purposes and on behalf of the Pennsylvania Railroad, and Pennsylvania Railroad was responsible for causing its organization and promotion. Pennsylvania Railroad was not at any time the owner of stock or voting trust certificates of Pennroad, yet it was in a position to effectively control and dominate the Pennroad as fully as if it were the owner of all or a majority of the outstanding stock.

22. In the transactions complained of in the present suit, Pennroad did not act

as an independent company serving its own purposes primarily but on the contrary acted in the interest of and for the purpose of benefitting Pennsylvania Railroad by the accomplishment of its plans and purposes.

23. Pennroad continues to own stock of the D. T. & I., P. & W. Va., Canton Company, New York, New Haven & Hartford, Boston & Maine and it held stock of Seaboard until 1939 and 1940.

24. The organizing, promoting and financing of Pennroad was the result of and pursuant to a plan and design conceived and executed by and on behalf of Pennsylvania Railroad acting through its officials, managers and directors to create a corporation with large capital, to control such corporation by means of a voting trust with trustees chosen from its own officials and directors, and by selecting its own directors as the directors of the new corporation with the view to offering to the public, and more especially to the stockholders of Pennsylvania Railroad, the voting trust certificates, the funds to be derived therefrom and the corporate powers of Pennroad to be used primarily in the acquisition of railroad securities and properties for the benefit and advantage of Pennsylvania Railroad, and with the expectation that profits and benefits would accrue to the investors.

25. The original directors of Pennroad who were also directors of Pennsylvania Railroad participated in and were the active agents of Pennsylvania Railroad in formulating and executing the said plan.

26. The complainant Overfield on April 24, 1929, was the owner of stock of Pennsylvania Railroad and as such was entitled to subscribe for voting trust certificates of Pennroad and did so subscribe. As the holder of such voting trust certificates she was offered and did subscribe for voting trust certificates of Pennroad on October 8, 1929, and she retained said voting trust certificates until the termination of the voting trust agreement and is now the owner of 254 shares of Pennroad stock.

27. The officers, directors and voting trustees of Pennroad were initially the nominees of Pennsylvania Railroad and as such accomplished the formation and operation of Pennroad and carried out and perpetuated the plan and the operation of Pennroad during the periods of their service in the manner originally intended.

They and the subsequent officers, directors and voting trustees have taken no action to represent or protect the interests of certificate holders in prior litigation. The individual and corporate defendants in this and prior cases have entered a denial of the alleged impropriety of their acts and a declaration of intention to resist any effort to question the directors' performance of their duties. By reason of such facts and circumstances the officers, directors and voting trustee stockholders of Pennroad were not in a position to adequately represent and protect the interests of the certificate holders independently and free of the conflict of their interests in behalf of Pennsylvania Railroad.

28. The certificate holders did not constitute an organized body having any right to take part in the operation, control or management of the company in which they had invested. Their representatives were the voting trustees responsible with others for the formation of the plan which precluded any concerted action on the part of the certificate holders, and the successors of such voting trustees. The certificate holders suffered losses as a result of the operation and management of Pennroad by the officers, directors and voting trustees thereof for the benefit of Pennsylvania Railroad.

29. Pennsylvania Railroad caused Pennroad to engage in the freight forwarding business by organizing the National Freight Company in furtherance of the plans of Pennsylvania Railroad to enter into that field in competition with other railroads engaged therein through their subsidiaries. Pennroad's capital was invested therein exclusively. National Freight Company was a new enterprise speculative in character and which subjected Pennroad to the whole risk while Pennsylvania Railroad enjoyed the benefits therefrom.

30. National Freight Company was an agency or instrumentality of Pennsylvania Railroad created at its instance and operated as an adjunct and for the purposes of Pennsylvania Railroad in placing it in a more advantageous competitive position with other lines in the freight forwarding field, and from which Pennsylvania Railroad obtained profits from shipments and rentals from its facilities.

31. Pennroad's purchase of Detroit, Toledo & Ironton stock was induced by Pennsylvania Railroad and was made in

pursuance of Pennsylvania Railroad's prior negotiations for such purchase in which it was intended that the stock should be acquired by Pennsylvania Railroad's subsidiary, Pennsylvania Company. The purposes of such purchase were to bring Detroit, Toledo & Ironton into the sphere of influence of Pennsylvania lines, to increase its freight traffic through the co-operative management of D. T. & I. and to improve Pennsylvania Railroad competitive position and its situation with regard to proposed consolidation by precluding other lines from acquiring it.

32. Pennroad's purchases of Canton Company and Pittsburgh & West Virginia stocks were induced by Pennsylvania Railroad for like purposes.

33. The purchases by Pennroad of stock of Seaboard Airline, Lehigh Valley, New York, New Haven & Hartford, and Boston & Maine were made in furtherance of the plans and under the domination of Pennsylvania Railroad to bring a closer affiliation and operating alliance of those roads with Pennsylvania Railroad through the cooperative ownership of its instrumentality, Pennroad. The primary objectives sought by such purchases were the benefit to be derived by Pennsylvania Railroad through the extension of its influence into the fields in which said roads operated, the procuring of freight traffic from such sources and the prospective assurance of friendly management for the continuance of friendly cooperation with Pennsylvania Railroad.

34. The prices paid for Pennroad acquisitions took into account the prospective benefit expected to be derived by Pennsylvania Railroad from such investments and the cooperative friendly ownership thereof by Pennroad.

35. Pennsylvania Railroad and the individual defendants, prompted by the desire and intention to further the interests of Pennsylvania Railroad and to secure for it indirectly the benefits and advantages which might arise from friendly control or relationship with other railroads not possible for it to acquire directly without the approval of the Interstate Commerce Commission, concertedly and deliberately formed and consummated a plan to organize and operate Pennroad as an ostensibly independent corporation free of legal restrictions as to railroad investments, but which was intended to and did serve the purpose of bringing into affiliation and control of Pennsylvania Railroad other railroad properties and securities contrary to the laws and regulations then existing.

## Conclusions of Law.

1. Pennsylvania Railroad and the individual defendants by reason of their actions in forming and operating Pennroad primarily for the benefit of Pennsylvania Railroad and its stockholders, and employing the capital investments of Pennroad certificate holders for that purpose, assumed a fiduciary relationship and obligation toward Pennroad and its investors.

2. The actions of said defendants in inducing and directing Pennroad purchases and investments in the interests of and for the benefit of Pennsylvania Railroad constituted a breach of their fiduciary duties for which they are accountable.

3. Pennroad constituted an agency or instrumentality of Pennsylvania Railroad for the accomplishment of purposes and acquisition of interests in or control of other railroads.

4. National Freight Company was also an agency or instrumentality of Pennsylvania Railroad, formed through and by means of its domination or control of Pennroad, for the purpose of establishing Pennsylvania Railroad in the freight forwarding business in competition with other railroads engaged in the same business.

5. The actions of the individual defendants were induced by Pennsylvania Railroad and were taken for and resulted in its primary benefit and not to the benefit or advantage of said individuals.

6. The bills of complaint should be dismissed as to the individual defendants by reason of the applicability of the statute of limitations of the State of Pennsylvania to actions against directors of corporations.

7. The complainants have not been guilty of such laches as would in equity bar the present actions, nor has delay or the death of some of the directors caused the defendants to be prejudiced.

8. The purpose or motive of the complainants in bringing this action does not affect the duty of the court to grant relief consistent with the clear equities of the parties.

626

9. The Pennsylvania Railroad being the dominant fiduciary and the sole beneficiary of the acts constituting a breach of the fiduciary obligations of the defendants done under its domination, may be held solely accountable regardless of the death of any of the individual defendants or their release by operation of the statute of limitations.

10. The complainants were not bound to do a vain or useless thing, i. e., make demand upon the directors or stockholders for the protection of their interests under circumstances showing clearly that such directors would or could not so act, as a condition precedent to the institution of the present actions.

11. Pennsylvania Railroad is required to reimburse Pennroad for the full amount of capital contributed by Pennroad to the National Freight Company enterprise less the net amount received by Pennroad from the final disposition of its investments therein. Pennsylvania Railroad is further required to state an account of all receipts and disbursements and of all net profits received by it attributable to or arising out of the operation of National Freight Company during the period in which Pennroad's capital was employed therein, and to pay and remit all such net profit to Pennroad.

12. A further inquiry should be made as to the various elements entering into a determination of values and the prospects of the Pennroad investments in railroad securities and the losses and the causes of decline in values, with the view to establishing a fair and equitable measurement of the redress to be granted and of the financial obligation to be imposed.

The parties have submitted numerous requests for findings of fact and conclusions of law. They have been considered fully in the light of the evidence and of the arguments of counsel, and for the purposes of the record are ruled upon as follows:

Requests for findings of fact affirmed without comment or qualification are those submitted on behalf of Joseph Wayne, Jr., Nos. 1 to 7, inclusive; Levi L. Rue Nos. 1 to 10, inclusive, 14, 15, 16, 18, 19; A. J. County Nos. 1, 2 and 3; H. H. Lee Nos. 1, 2 and 3; E. B. Morris Estate Nos. 1, 2 and 3; C. E. Ingersoll Estate Nos. 1, 2 and 3; Jay Cooke Estate Nos. 1, 2 and 3; A. J. County, H. H. Lee, Estates of E. B. Mor-

ris, C. E. Ingersoll and Jay Cooke jointly Nos. 1, 7, 8, 11, 12 and 13; W. W. Atterbury Estate Nos. 1, 2, 3, 4, 6, 8, 12, 13, 14, 16, 17, 18 and 19; Pennsylvania Railroad Nos. 1 to 15, inclusive, 23, 26, 27, 30, 31, 40, 43, 44, 45, 55, 56, 64, 72, 104, 105, 106, 107, 108, 113, 133, 134, 145, 150, 156, 163, 164, 165, 177, 179, 182, 183, 184, 185, 186, 194, 197, 200, 203 and 206; and on behalf of the complainants, Nos. A-1, 2, 3, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 17, 23, 24, 26, 27, 28, 32, 33, 34, 35, 36, 38, 39, 42, 43, 44, 49, 50, B-1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 13, 15, 16, 22, 26, 31, C-1, 2, 4, 5, 7, 8, 9, 12, 14, 15, 16, 17, 19, 20, 21, 22, 23, 24, 31, D-1, 3, 6, 9, 10, 11, 15, 16, 20, E-1, 2, 4, 6, 7, 10, F-2, 13, G-1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 14, 15, 16, 18, 20, 30, 31, 32, 35, 40, H-5, 7, 11; R. B. Mellon Estate Nos. 1, 2, 3, 4, 5, 7, 8, 11, 12, 14, 17, 18 and 20.

Other requests for findings of fact are affirmed as to factual substance without the adoption of the exact language of the request. In view of the great number of facts, and the differences in the views of the contesting parties with the possibility of confusion from varying forms of description and expression, the findings should not be limited to the wording of the requests. The requests so affirmed are those on behalf of Levi L. Rue Nos. 13 and 17; A. J. County, H. H. Lee, Estates of E. B. Morris, C. E. Ingersoll and Jay Cooke jointly Nos. 2, 9; W. W. Atterbury Estate No. 15; Pennsylvania Railroad Nos. 24, 25, 28, 29, 36, 73, 74, 75, 82, 139, 140, 146, 159, 195, 201, 207; and on behalf of the complainants Nos. A-4, 11, 16, 18, 19, 20, 21, 22, 25, 29, 30, 31, 37, 45, 47, B-11, 12, 14, 17, 18, 19, 20, 21, 25, 28, C-3, 6, 10, 11, 13, 26, 29, 30, 32, D-2, 4, 5, 7, 8, 12, 14, 17, E-5, 8, 12, F-1, 3, 4, 5, 6, 7, 8, 9, 10, 14, G-11, 12, 13, 17, 19, 21, 24, 26, 27, H-1, 2, 3, 4, 6; R. B. Mellon Estate Nos. 6, 19 and 21.

Certain of the requests presented are refused for the reason that the manner of their statement or the inferences therefrom are at variance with the views of the court, or because they do not state fully all of the essential elements or conditions relating to the subject. The requests refused as stated are: Those of Levi L. Rue Nos. 11, 12; A. J. County, H. H. Lee, Estates of E. B. Morris, C. E. Ingersoll and Jay Cooke jointly Nos. 3, 4, 6; W. W. Atterbury Estate Nos. 5, 7; Pennsylvania Railroad Nos. 21, 32, 35, 61, 62, 66, 67, 68, 71,

77, 79, 81, 83, 84, 85, 86, 87, 89, 90, 96, 101, 102, 103, 114, 117, 118, 119, 120, 121, 122, 124, 125, 128, 129, 135, 136, 137, 141, 147, 151, 152, 154, 160, 166, 170, 176, 178, 196; and of the complainants Nos. A–40, 41, 48, B–23, 24, 32, C–27, 28, 33, D–18, E–3, 9, 13, F–11, 15, G–22, 23, 34, 36, 37, H–8, 9; E. B. Mellon Estate Nos. 9, 10, and 13. Those refused as not being entirely consistent with the facts and conclusions reached or which the court declines to affirm because of the views expressed in the previous discussion are those of W. W. Atterbury Estate Nos. 9, 11, 20, 21, 22, 23; Pennsylvania Railroad Nos. 37, 38, 41, 51, 59, 60, 63, 69, 70, 76, 88, 95, 97, 98, 99, 100, 130, 131, 132, 138, 148, 149, 153, 155, 158, 161, 162, 167, 168, 171, 174, 175, 181, 187, 188, 189, 190, 191, 193, 199, 202, 205; complainants Nos. A–46, B–27, 29, 30, 33, 34, C–18, 25, 34, D–13, 19, E–11, 14, F–12, 16, G–25, 28, 29, 33, 38, H–10; R. B. Mellon Estate Nos. 15 and 16. The requests for findings of fact refused as contrary to the facts found, inadequately proven, or not pertinent to the issue include those of A. J. County, H. H. Lee, Estates of E. B. Morris, C. E. Ingersoll and Jay Cooke jointly Nos. 5, 10, 14; W. W. Atterbury Estate No. 10; Pennsylvania Railroad Nos. 16, 17, 18, 19, 20, 22, 33, 34, 39, 42, 46, 47, 48, 49, 50, 52, 53, 54, 57, 58, 65, 78, 80, 91, 92, 93, 94, 109, 110, 111, 112, 115, 116, 123, 126, 127, 142, 143, 144, 157, 169, 172, 173, 180, 192, 193, 198, 204; complainants Nos. B–35, D–21, E–15, F–17, G–39.

■ Requests of the various parties for conclusions of law which are consistent with those expressed herein and theretofore affirmed are: those of Joseph Wayne, Jr., Nos. 1 to 5, inclusive; Levi L. Rue Nos. 3 to 11, inclusive; A. J. County, H. H. Lee, Estates of E. B. Morris, C. E. Ingersoll and Jay Cooke jointly Nos. 5, 6, 7, 8, 9; W. W. Atterbury Estate Nos. 2, 5, 6, 7, 8, 13, 14; Pennsylvania Railroad Nos. 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 22, 31, 34, 37, 40, 41; complainants Nos. 1, 2, 3, 7; R. B. Mellon Estate Nos. 3, 4, 5, 6, 7, 15 and 16. Requests No. 2 of Levi L. Rue, Nos. 3 and 4 of A. County et al, Nos. 3, 4 and 9 of W. W. Atterbury Estate, dealing with the law applicable in federal courts are affirmed generally, but with the qualification that the principles involved may not be applied where to do so would be inequitable or would not serve the ends of justice under the circumstances of the case. Re-

quests for conclusions refused are those of Levi L. Rue No. 1, A. J. County et al, Nos. 1, 2, 10; W. W. Atterbury Estate Nos. 1, 10, 11, 12; Pennsylvania Railroad Nos. 1, 13, 14, 15, 16, 17, 18, 19, 20, 21, 23, 24, 25, 26, 27, 28, 29, 30, 32, 33, 35, 36, 38, 39, 41, 42, 44 to 53, inclusive; and of the complainants Nos. 4, 5, and 6; R. B. Mellon Estate Nos. 1, 2, 8, 9, 10, 11, 12, 13 and 14. Those requests for findings or conclusions which charge or infer an intentional fraud or deliberate conspiracy designed and intended to defraud Pennroad or its certificate holders have been refused. As indicated previously the actions of the defendants in the formation and management of Pennroad to serve the interests of the Pennsylvania Railroad in the accomplishment of a purpose which it could not accomplish in its own capacity, but with the honest conviction that they were fulfilling their duties, constituted at most a constructive or legal fraud upon those who suffered thereby. There was a conflict of interests between the interlocking directorates rendering it impossible for the directors to give undivided loyalty to the different interests which they were bound to serve, and it has been found that the predominating loyalty was to Pennsylvania Railroad as the parent and organizer of Pennroad. The actions taken were in pursuance of a premeditated plan prompted by the desire and executed with the intention of primarily serving the best interests of Pennsylvania Railroad and its stockholders and wholly innocent of any intent to injure or harm the Pennroad. Their actions may not properly be described in the language of the common deliberate conspiracy to commit an intentional fraud; they are the actions of honest men formulating and executing plans, the full legal significance of which is not appreciated, and which constitute a breach of the fiduciary obligations imposed upon them by law. Their dual position of itself placed them in a position where such breach might have been committed toward either side at any time and their failure to distinguish or conceive the exacting obligations imposed upon them by law toward Pennroad and its certificate holders should not characterize them as common conspirators in the accepted sense of that term. The results, however, are somewhat similar for by virtue of the breach, by whatever term described, a definite obligation is imposed.

The requests for findings and conclusions having to do with evidence and its admissibility have been considered, and a review of the evidence upon which the findings are based confirms the conclusion that such evidence is fully admissible. Most of the pertinent letters, memoranda and documents made by the individual defendants or by the officials or employees of the corporate defendants and found in their files were identified or explained by their authors or responsible officers of the defendants from the witness stand. The minute books, by-laws, voting trust agreement, forms of offering letters, memoranda of instructions and inter-corporate proceedings, negotiations, reports and the communications between officials of the defendants having a direct bearing upon the joint actions of the defendants in the formation and consummation of the plan, were all taken from the corporate files and identified and explained by one or more of the officers of a defendant corporation. Their testimony further described the relationship of the parties, the sending of letters, warrants, trust certificates, and the circumstances of the initial financing and subsequent borrowings, and established the pertinency of the documentary evidence to the issue as to the existence of a combination of persons to do the acts here in question.

The greater portion of the evidence relied upon, in addition to the comprehensive narrative testimony given, included the official corporate documents and the memoranda and letters of Messrs. Lee, County, Morris, Atterbury, Cooke and the executives and other officials connected with the operation and management of the corporate defendants, and which related expressly to the matters involved in the complaints. Other unidentified memoranda, reports, investigations or expressions of opinion made by persons not identified or connected with the corporate defendants have not been accepted as the basis of any findings and conclusions, and unless a direct issue is raised as to particular exhibits or offers there would seem to be no purpose served by an express ruling here upon the admissibility of such evidence.

The rules of evidence are designed to enable the court to base its findings of fact as much as possible upon the sworn testimony of witnesses. The statutory rules provide that "* * * any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of said act, transaction, occurrence, or event, if it shall appear that it was made in the regular course of any business, and that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter. * * *" (Act of Congress of June 20, 1936, C. 640, Sec. 1, 49 Stat. 1561, 28 U. S.C.A. § 695.) The Pennsylvania Business Records As Evidence Act, (May 4, 1939, P.L. 42, 28 P.S. Pa. § 91b) relating to such evidence provides: "A record of an act, condition or event shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

From the testimony given as to the official acts of the defendants, the methods of corporate and inter-corporate dealings and of the memoranda and records kept, there can be no doubt that the writings and records upon which findings are based were made in the regular course of the defendants' business, that they were part of the official files relating to the particular transactions, and that it was the business practice to maintain such records. The custodians or other qualified witnesses have identified such evidence as to its character and substance and established its authenticity to the satisfaction of the court. It would also seem that such evidence is admissible as to all of the defendants in view of the finding that there was a combination between them for the purposes described. "It depends upon the principle that when any number of persons associate themselves together in the prosecution of a common plan or enterprise, lawful or unlawful, from the very act of association there arises a kind of partnership, each member being constituted the agent of all, so that the act or declaration of one, in furtherance of the common object, is the act of all, and is admissible as primary and original evidence against them." Hitchman Coal & Coke

Co. v. Mitchell, 1917, 245 U.S. 229, 38 S. Ct. 65, 72, 62 L.Ed. 260, L.R.A.1918C, 497, Ann.Cas.1918B, 461.

■ The fact that much of the evidence was identified or given by defendants or officials under cross-examination is immaterial, such practice being sanctioned by the Pennsylvania acts, May 23, 1887, P.L. 158, Sec. 7, 28 P.S.Pa. § 324, March 30, 1911, P.L. 35, 28 P.S.Pa. § 381, and the present Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. The issue raised as to whether the officials and stockholders of the corporate defendants are competent to testify against the decedents' estates by reason of the Pennsylvania act of May 23, 1887, P.L. 158, becomes unimportant because of the application of the statute of limitations to the actions against the individual defendants and needs no discussion.

Chief Justice Marshall's statement that "Equity delights to do complete justice * * * not by halves" expresses the feelings and desires of a chancellor, with the responsibility of interpreting the motives and purposes of his fellowman in a matter of this kind. "Complete justice?" What a noble purpose and how inadequate the instrument. For approximately eighty full days of court proceedings the parties to this cause appeared on the witness stand, men and women on both sides of the highest character, sworn to tell the truth. It is the chancellor's firm belief that so far as the *actions* of the parties are concerned there is not one important item of available truth missing. In giving their testimony not a word, not a gesture, not an expression of voice or of emotion but had its meaning and significance. The complainants told their stories and produced certain admittedly relevant records. The defendants gave their testimony and did likewise. Chief counsel for the complainants, with a sportsmanship and fairness most impressive, on several occasions disclaimed any idea of imputing sordid and dishonorable motives to the defendants. But the pleadings on record in the files of the court charge fraud and conspiracy. These charges stand out for all time as charges of personal dishonesty. The disclaimer of such by a fair-fighting counsel for complainants may never be read. In order to do complete justice and not by halves it becomes the duty of the chancellor to make a clear and straightforward statement on the subject of personal morality. Reference has been made in this opinion on several occasions to the effect that the defendants sought no sordid gain for themselves or gain that would not be secured to every other stockholder. But a more complete statement is required. It was evident from the very manner and attitude of the defendants on the stand that to them their personal honor was of more importance than any other feature of the case. Those defendants, living and dead, had lived their lives in our midst. They were well and favorably known. Their lives and actions had been such as to merit the complete confidence of their fellow-citizens. For their benefit and for the information of all the chancellor wishes to make plain that the findings of fact and conclusions of law in this case in no way cast any improper reflection on the personal honor and integrity of the defendants. They are and were of the generation immediately ahead of us. That was the generation of those whose fathers had fought in the Civil War, that came on in the period after the Civil War, and who developed this country's resources; that brought us up from an agricultural country, dependent upon Europe for so many things, into a manufacturing and industrial Nation, largely independent, self-sufficient and self-reliant. They were of the same mould as the men and women who boldly launched out into the prairies and won the west, and pushed the frontiers of our country across to the beaches of the Pacific. These men by their courage, by their resourcefulness, yes, even by their very boldness at times made this country what it is today, the good with the bad. No American can deny that the good predominated and that as a whole they served us well. We can hold them responsible for a mistaken zeal at times in their loyalty to their corporate groups. We can find them misconstruing the fine purposes and objectives of the corporate structure and at the same time, as under the facts of this case, find these predecessors on the stage of our National life, to be true men, worthy of our respect. We can even express the hope that those who follow them may do as well.

The chancellor wishes to state this not that it may minimize the effects of, and conclusions to be drawn from his findings, but in order that there may be no mis-

understanding as to what these findings really mean. Humanity is prone to criticism. It is easy for us to impute improper motives. Prejudice causes us to look with jaundiced eye at the weaknesses of those that the world calls "successful". This destructive criticism where no immorality is present works real harm to organized society and great injustice to the individual unjustly charged. The chancellor hopes no unkind conclusions will be drawn from these findings because he asserts with all positiveness no such conclusions are warranted.

He would like to give expression to one more thought. Perhaps complete justice does not require it but he feels that he would be ungrateful if he did not mention it. He refers to the attitude of counsel in this case. Throughout all the weeks of this great trial counsel on both sides gave an illustration of the highest performance of legal duty. They conducted the case with the highest ability and skill. To each and everyone the chancellor wishes to express his appreciation and gratitude for the help given during the trial and in the briefs furnished. To one of counsel who represented his deceased father the chancellor wishes to say that the eloquent appeal, seldom equalled or surpassed, coming from a son in defense of his deceased father and of his father's friend, left an impression that will remain during the years that are to come.